In The



Court of Appeals



Ninth District of Texas at Beaumont


____________________



NO. 09-01-377 CV 


____________________



U.S. SILICA COMPANY, Appellant



V.



RUBY L. TOMPKINS, INDIVIDUALLY AND AS EXECUTRIX OF THE


ESTATE OF DONALD L. TOMPKINS, DECEASED, SHERRI LOPEZ


AND DAWN MALDONADO, Appellees






On Appeal from the 60th District Court


Jefferson County, Texas


Trial Cause No. E-162,276






MEMORANDUM TO CLERK


 You are directed to make the following correction in the Opinion dated November
21, 2002:

 On page 10, the second line, change the word and to as and add an apostrophy to
the last word which is products to products'.

 You will give notice of this correction in the original Opinion by sending a copy of
the corrected page accompanied by this memorandum to all interested parties who received 
a copy of the original Opinion.

 Entered this the 2nd day of December, 2002. 

 PER CURIAM

In The



Court of Appeals



Ninth District of Texas at Beaumont



____________________



NO. 09-01-377 CV


____________________



U.S. SILICA COMPANY, Appellant



V.



RUBY L. TOMPKINS, INDIVIDUALLY AND AS EXECUTRIX OF THE 
ESTATE OF DONALD L. TOMPKINS, DECEASED, SHERRI LOPEZ

AND DAWN MALDONADO, Appellees






On Appeal from the 60th District Court


Jefferson County, Texas


Trial Cause No. E-162,276






OPINION


 U.S. Silica Company ("U.S. Silica"), formerly known as Pennsylvania Glass Sand
Company ("PGS"), and the successor-in-interest to Ottawa Silica Company ("Ottawa"), 
appeals a judgment awarding Ruby L. Tompkins, Individually and as Executrix of the
Estate of Donald L. Tompkins, Deceased, Sherri Lopez, and Dawn Maldonado,
(collectively "The Tompkinses") damages for personal injuries resulting from Donald L.
Tompkins's ("Tompkins") use of a silica product supplied by U.S. Silica Company or its
predecessor corporation. U.S. Silica presents five issues in its appeal. 

 Issue one asks: "Was there legally and factually sufficient evidence that PGS's and
Ottawa's marketing defect was a producing cause of Tompkins' silica-related injury?"
Issue two asks: "Was there legally and factually sufficient evidence that PGS's and
Ottawa's negligence (failure to warn) was a proximate cause of Tompkins' silica-related
injury?" In these issues, the appellant challenges the jury's marketing defect and
negligence findings. 

 Tompkins worked as an abrasive blaster, first for Newsome & Work Sandblasting
Company ("Newsome") over a six-year period beginning in the 1960s then for Akron Sand
Blasting ("ASB") for another six years in the 1970s, and finally for F.W. Gartner
Company ("Gartner") in a six-year period in the 1980s. (1) Tompkins wore an MSA brand
air-fed hood while sandblasting for ASB and Newsome and wore a paper dust mask while
cleaning up a site. Tompkins and his co-employees identified PGS and Ottawa as brands
of sand used by Newsome and ASB during Tompkins's period of employment. During
that period of time PGS and Ottawa did not place any silicosis warning labels on their bags
of sand. By the time Tompkins worked for Gartner, virtually all companies in the sand
industry had started warning. In the 1980s, Tompkins used sand provided by Pioneer,
Lone Star, and Clemtex. The Lone Star sand used at Gartner was, to Tompkins's
recollection, bulk sand. Lone Star's post-1976 Texblast bags stated: "Use only with
government approved face mask. Warning: Contains free silica. Do not breathe dust. 
May cause delayed lung injury silicosis." Tompkins could not recall seeing labels on the
bags of sand when he worked for Gartner. 

 In the absence of a warning, a rebuttable presumption arises that the user would
have heeded the warning had one been provided. American Tobacco Co. v. Grinnell, 951
S.W.2d 420, 431 (Tex. 1997). The defendant may rebut the presumption with evidence
that the plaintiff failed to heed whatever warnings were given, and would not have heeded
any proposed warning. Id. Once the presumption is rebutted, the plaintiff must prove
causation as in any other case. General Motors Corp. v. Saenz, 873 S.W.2d 353, 357
(Tex. 1993). The appellant contends there is no evidence that Tompkins would have
heeded a warning had PGS and Ottawa placed one on the bags of sand sold for abrasive
blasting because Tompkins did not notice the warnings placed on the sand bags that he
used in the 1980's. Therefore, U.S. Silica argues, Tompkins would not have heeded
warnings had they been provided in the 1960's and 1970's. 

 The appellant compares its case to Dresser Industries, Inc. v. Lee, 880 S.W.2d 750,
754 (Tex. 1993), a products liability silicosis case in which the Supreme Court held that
a fact issue on the employer's negligence as sole cause of the injury was raised by evidence
that the plaintiff seldom used a mask or respirator even though the dust in the improperly
ventilated foundry bothered him so much that he had to spit. The appellant points to two
factors that it claims serve to rebut the presumption that a warning would have been heeded
by Tompkins. While employed by Newsome and ASB, Tompkins worked in a dusty
working environment without air monitoring. And after warning labels were being
utilized, Tompkins continued to use sand for abrasive blasting in dusty working conditions
and with the same type of respiratory equipment. What U.S. Silica did not explain to the
jury was why Tompkins should have realized that the safety precautions he was taking
were inadequate to protect him from hazards connected to exposure to silica dust. In
addition to the evidence that Tompkins wore safety equipment while working, Tompkins
testified that if there had been warnings and he had not understood them, he would have
inquired of them with his employer. 

 Tompkins's failure to notice the warnings printed on bags of sand in the 1980s bears
on U.S. Silica's causation issues only if those warnings were noticeable and effective, but
nevertheless were ignored by Tompkins. Although there is evidence of the wording of the
warning that one supplier decided to place on its sand bags, U.S.Silica does not identify
the evidence presented to the jury that proved that the warning was noticeable. One
witness, Behzad Samimi, testified that the warnings placed on bags of sand in the late
seventies and early eighties were very fine print on huge bags and could barely be seen. 
The adequacy of a warning is a question of fact to be determined by the jury. Alm v.
Aluminum Co. of America, 717 S.W.2d 588, 592 (Tex. 1986). In this case, the warning
in question is not one provided by the defendant, but by a supplier more than a decade
after the exposure at issue in this case. Considering the circumstances of Tompkins's
exposure and the paucity of evidence concerning the adequacy of the warnings provided
in the 1980s, the jury reasonably could reject U.S. Silica's supposition that Tompkins
would not have heeded an adequate warning had PGS or Ottawa provided one. We hold
that the evidence is legally and factually sufficient that PGS's and Ottawa's marketing
defect was a producing cause of Tompkins's silica-related injury. We further hold that the
evidence is legally and factually sufficient that PGS's and Ottawa's negligence in failing
to warn Tompkins was a proximate cause of Tompkins's silica-related injury. Issues one
and two are overruled.

 Issue three asks this Court to adopt and apply the "sophisticated user" and
"intermediary" doctrines to excuse PGS and Ottawa from warning Tompkins of the
hazards of using silica in abrasive sandblasting. A similar argument was rejected in
Humble Sand & Gravel, Inc. v. Gomez, 48 S.W.3d 487 (Tex. App.-Texarkana 2001, pet.
granted), which is currently under submission before the Texas Supreme Court. U.S.
Silica suggests that we should adopt the dissent in Humble Sand and hold that U.S. Silica's
predecessor corporations had no duty to warn Tompkins of the silicosis hazard inherent
in the use of their products for abrasive sandblasting. We decline to adopt the Humble
Sand dissent in this case, because Tompkins's employers were not sophisticated
intermediary users in the sense that the employer in Humble Sand might have been.

 Newsome had seven employees in 1967, and 15 employees at its peak. It performed
sandblasting for utility companies. During Tompkins's tenure, ASB grew from 25 to 40
employees. It, too, performed professional sandblasting. Neither had any type of training
school or safety manuals. 

 The appellant contends that Tompkins's employers, Newsome and ASB, were
members of an industry, sandblasting, in which the dangers of silica were well known. 
Other than the fact that both companies provided safety equipment for their abrasive
blasters, however, the record reveals little evidence of Newsome's and ASB's actual
awareness of that danger while Tompkins was employed by them. U.S. Silica refers to
two witnesses who were employed by Tompkins's employers: Roger Newsome and John
Lee Cooper. Roger Newsome, the son of one of the original owners of Newsome, 
testified that as a high school senior in 1970 he began working as a general laborer for
Newsome. He learned that exposure to silica could be harmful to one's health at that time;
his father told him to keep his mask on because "sand is bad for you." The elder
Newsome did not tell him about invisible particles or mention anything specific about the
hazards. The younger Newsome had been told that he needed to wear an air-fed hood
when he blasted, but he did not think that he had to wear it when he was not blasting. No
written information was handed down to employees. There was no written protection
program in place. 

 John Lee Cooper, who began working for ASB in September 1967 as a sandblaster, 
testified that he was aware of the dangers of sandblasting when he started working for ASB
because he had been warned by his mother that silica sand was dangerous. When he
started working, however, he was not aware that silica sand could be disabling. He
became aware of that danger from the big warnings printed on every bag. Cooper could
not recall ever receiving any written safety materials from 1967 to 1980, and to his
knowledge there was not a person assigned to safety there, although he did recall that ASB
had safety meetings in the 1980s. 

 In 1976, a date some time after Tompkins began employment there, PGS sent ASB
a copy of the OSHA voluntary guidelines for occupational exposure to crystalline silica in
abrasive blasting and a copy of an OSHA Material Safety Data Sheet that included the
statement, "Repeated inhalation of respirable dust for extended period of time may cause
injury to the lungs." PGS sent the guidelines to all of its customers. The witness who
testified regarding these communications was Richard Day, who had been PGS's general
counsel since 1974 and who implemented their warnings program in 1977. Day did not
know what Tompkins's employers knew at the time Tompkins worked for them as a
sandblaster. He admitted that his company did no study to determine what its customers
knew about the health hazards related to sandblasting. The appellees, on the other hand,
refer to findings made by Dr. Samimi at the conclusion of a study he conducted for Boeing
Aerospace Company. According to Samimi, the study concluded that the purchasers of
sand did not even know about the hazards of sand and the necessity for respiratory devices.
 The appellant's argument, that it owed no duty to Tompkins because his employers
were sophisticated intermediaries who could be reasonably expected to protect their
employees from the hazards of the use of silica sand in abrasive blasting, does not
withstand close scrutiny. In the alternative, U.S. Silica argues that it was entitled to a jury
instruction on the issue. It requested two such instructions. One would have told the jury:
"PGS and Ottawa were not required to give warnings if they reasonably believed, at the
time Donald Tompkins used the product, that his employers knew of the products' dangers
and would protect his employees." The other provided: "PGS and Ottawa were not
required to give warnings or instructions if Donald Tompkins' employers knew or, in the
exercise of ordinary care, should have known of the products' dangers at the time Donald
Tompkins used the product and warned or, in the exercise of ordinary care, should have
warned Donald Tompkins of the products' dangers." The appellees contend that these
instructions were unnecessary surplusage. We agree. The trial court wields considerable
discretion in deciding what instructions are necessary and proper in submitting issues to
the jury. State Farm Lloyds v. Nicolau, 951 S.W.2d 444, 451 (Tex. 1997). Here, the trial
court instructed the jury that, if an act or omission of any person not a party to the suit was
the sole cause of the injury, then no act, omission, or product of any party to the suit could
have been a cause of the injury. The trial court also instructed the jury that adequate
warnings and instructions mean warnings and instructions given in a form that could
reasonably be expected to catch the attention of a reasonably prudent person in the
circumstance of the product's use. Naturally, the jury would not be called upon to
determine whether the producers of the sand had a duty to Tompkins, only whether the
defendants breached that duty and whether the breach of that duty caused the injury in
question. 

 Certainly there was no duty to warn about risks associated with a product that were
matters "within the ordinary knowledge common to the community." See Joseph E.
Seagram & Sons, Inc. v. McGuire, 814 S.W.2d 385, 388 (Tex. 1991); Caterpillar, Inc.
v. Shears, 911 S.W.2d 379, 382 (Tex. 1995). Here the jury was further instructed that
a failure to warn constituted a "marketing defect" if the "failure rendered the product
unreasonably dangerous as marketed"; and "unreasonably dangerous" was defined as
"dangerous to an extent beyond that which could be contemplated by the ordinary user of
the product with the ordinary knowledge common to the community as to the products'
characteristics." (emphasis added).

 Any factual issues to be resolved by the jury concerning the appellant's sophisticated
intermediary theory could be, and were, presented to the jury through the broad-form
causation instructions. U.S. Silica's requests were not reasonably necessary to enable the
jury to render a proper verdict. 

 Also in issue three, in a single paragraph, U.S. Silica also argues that the trial court
erred in excluding from evidence trade and scientific articles offered for the limited
purpose of showing knowledge in the abrasive blasting industry regarding the hazards of
silica dust. Assuming the trial court erred in excluding this evidence, the error is harmless
because that knowledge was not connected to Tompkins's employers and is not shown to
be other than cumulative. Tex. R. App. P. 44.1. Issue three is overruled.

 In its fourth issue, U.S. Silica contends that the plaintiffs failed to exclude smoking
as a cause of Tompkins's emphysema and death. Citing Merrell Dow Pharmaceuticals,
Inc. v. Havner, 953 S.W.2d 706, 714 (Tex. 1997), and E.I. du Pont de Nemours & Co.
v. Robinson, 923 S.W.2d 549 (Tex. 1995), the appellant contends that, in order to satisfy
their burden of proof, the plaintiffs must exclude with reasonable certainty plausible causes
of death other than silicosis. The Tompkins's medical experts agreed that smoking
contributed to the emphysema that killed Donald Tompkins. Therefore, U.S. Silica
reasons, appellees failed to prove that Tompkins's silica-related injury was a producing
cause and proximate cause of his injury and death. 

 The act of the defendant need not be the sole cause of an injury. There may be
more than one producing cause or proximate cause of an injury. Haynes & Boone v.
Bowser Bouldin, Ltd., 896 S.W.2d 179, 182 (Tex. 1995); Wilson v. Brister, 982 S.W.2d
42, 44 (Tex. App.--Houston [1st Dist.] 1998, pet. denied). Dr. Gary Friedman testified
that Tompkins died from the complications of silicosis and chronic obstructive pulmonary
disease. According to Dr. Friedman, "part of the COPD is due to silicosis and some of
it is due to smoking." Tompkins had, in his estimation, one of the most severe pulmonary
impairments in a person with his smoking history. The doctor identified characteristics
in Tompkins's lungs that were classic for silicosis and not for smoking. Smoking, he
testified, does not cause confluence or firm nodular lesions. Dr. Jerrold Abraham, a
pathologist, testified that, in reasonable medical probability, exposure to silica was a cause
of Tompkins developing emphysema. In his opinion, smoking was also a major cause of
Tompkins's emphysema, but Tompkins "had more emphysema because of his silica
exposure than he would have had just from smoking." According to Dr. Abraham, "his
lung was impaired by his combination of silicosis and emphysema and that silica
contributed to both of those so that he ran out of functioning lung because of those diseases
[,] because of that silica exposure [,] sooner than he would have had he not had them, had
he not had the silica exposure." 

 U.S. Silica adduced expert testimony that Tompkins suffered from severe panlobular
emphysema in 90% to 100% of his lungs, and mild simple silicosis in 5% to 7% of his
lungs. Its pathologist testified that Tompkins's scarring emphysema from his silicosis
accounted for only 5% of his emphysema, and would not change his lung function or life
expectancy. In reviewing the record, we find that both parties presented extensive expert
evidence and medical evidence to support the experts' opinions. As the sole judge of the
credibility of the witnesses and the weight to be given their testimony, the jury could
accept or reject either theory. The record clearly indicates that there was both legally and
factually sufficient evidence presented to sustain the plaintiffs' burden of proof on
causation. Issue four is overruled. 

 Issue five urges the trial court erred in excluding from evidence a CT scan report
and testimony interpreting that report. On October 30, 2000, Tompkins had a high
resolution CT scan taken of his lungs. Dr. Bill Kistler, a radiologist, reviewed the scan
report and prepared a report interpreting it. A regular CT scan had been performed a few
days earlier, and Dr. Kistler's report referred to this earlier date, but he was sure that he
reviewed a complete high-resolution scan because that was what he reported. Dr. Kistler's
report states that he found no evidence of interstitial fibrosis. The scan was ordered by the
plaintiffs' expert, Dr. Gary Friedman, who was not a treating physician. Dr. Friedman
suggested the scan because a July 2000 x-ray indicated the presence of a nodular mass on
the lung. The scans were apparently lost by the hospital and never sent to Dr. Friedman,
who noticed the report for the first time when he prepared for his deposition. Dr.
Friedman contacted the treating physician, who decided not to retake the test because there
had been no change in the suspected area between July and December, Tompkins was
already hospitalized, and his condition was so grave that it would not have made a
difference. According to Dr. Friedman, Dr. Kistler could not confirm that the scan was
Tompkins's and failed to perform the scan according to his instructions or standard
protocol, and mishandling of the films by the hospital resulted in their being lost. Dr.
Friedman concluded that Dr. Kistler's report was unreliable, incorrect, and inconsistent
with the radiologic and pathologic evidence, and merited no consideration by any party. 

 At trial, U.S. Silica argued that the excluded evidence was relevant to the issue of
the disease process. The trial court's denial of the defendant's tender was, according to
the Tompkinses, within the court's discretion because it was so unreliable as to be
irrelevant. We disagree. The absence of evidence of interstitial fibrosis on the scan was
relevant to the extent of Tompkins's impairment from silicosis. The attendant
circumstances went to the weight of the evidence rather than its admissibility. We hold
that the trial court erred in excluding Dr. Kistler's report.

 Having found error, we must determine whether the error complained of probably
caused the rendition of an improper judgment. Tex. R. App. P. 44.1(a)(1). We must
review the entire record in order to determine whether the whole case turned on the
excluded evidence. City of Brownsville v. Alvarado, 897 S.W.2d 750, 753-54 (Tex.
1995). U.S. Silica argues that the CAT scan was a more accurate depiction of Tompkins's
condition during his life than the numerous x-rays that the experts interpreted for the jury.
The Tompkinses argue that the error would be harmless because the pathologists for both
the plaintiff and the defense found silicosis to be present in Tompkins's lungs and,
confirmed the radiologic evidence and clinical evidence. 

 Dr. Kistler explained that the interpretation of the x-rays could simply be mistaken,
because the CT is a more accurate depiction of actual pathology than x-rays, and the
pathologists autopsy reports could have detected interstitial fibrosis that the CT could not
detect. Thus, the evidence would have been helpful to the jury in determining the extent
of Tompkins's silicosis. However, in this case the parties' experts had available to them
the actual lungs for analysis and formation of their expert opinions. Dr. Friedman did not
rely on the scan or on Dr. Kistler's report in forming his expert opinion because he could
not confirm their reliability. None of the experts who testified relied on the CT scan or
on Dr. Kistler's report in forming a medical opinion. Dr. Kistler's report was subject to
serious attack on its reliability that substantially affected its weight. U.S. Silica's
pathologist, Dr. Francis Green, testified that Tompkins had mild chronic silicosis in five
to seven percent of his lungs, that would not impair his lung function or life expectancy. 
Thus, the excluded evidence was cumulative of other, stronger, evidence submitted to the
jury. Issue five is overruled. The judgment is affirmed.

 AFFIRMED.

 ___________________________

 RONALD L. WALKER

 Chief Justice

 

Submitted on June 13, 2002

Opinion Delivered November 21, 2002

Publish

Before Walker, C.J., Burgess and Gaultney, JJ.
1. These dates are approximate. The jury heard conflicting evidence on exact dates
of Tompkins's employment. This evidence supports a conclusion that no silicosis warnings
were provided to Tompkins by U.S. Silica's predecessors. We also note that Tompkins
worked as a sandblaster for McDermott Industries in between his employment with
Newsome and ASB. Since neither party mentions this fact in its brief, we will assume it
lacks significance.