Lawrence B. GRAY, Appellant,

v.

BADGER MINING CORPORATION, individually and as successor-in-interest to the C.A. Chier Sand Company, Respondent, Carpenter Brothers, Inc., et al., Defendants.

No. C4–02–2052.

Supreme Court of Minnesota.

March 18, 2004.

Michael S. Polk, Michael S. Strom, Sieben Polk, Laverdiere, & Dusich, P.A., Hastings, for Attorneys for Appellant Lawrence B. Gray.

Robert E. Diehl, Cynthia R Bartell, Foley & Mansfield, P.L.L.P., L. John Argento, Cathy R. Gordon, Thomas J. Jezewski, Dickie, McCamey & Chilcote, P.C., Pittsburgh, PA, for Attorneys for Respondent Badger Mining Corporation.

Wilbur W. Fluegel, Esq., Minneapolis, for Amici curiae, American Tort Reform Association.

David F. Zoll, David Evans, Arlington, VA, Lateesa T. Ward, Ward & Ward, L.L.C., Minneapolis, for Amici curiae, American Chemistry Council.

## OPINION

HANSON, Justice.

This appeal focuses on the district court's denial of a motion for summary judgment brought by a supplier of silica to dismiss the products liability claim of an

injured foundry worker. The issue is whether the raw materials supplier, respondent Badger Mining Corp. (Badger Mining), breached a duty to warn the worker, appellant Lawrence B. Gray (Gray), of hazards associated with the use of silica in foundry processes. The court of appeals reversed the district court, holding that because Gray's employer, Smith Foundry, was a sophisticated purchaser and Badger Mining was a bulk supplier, Badger Mining had no duty to warn Gray of the dangers of silica dust. Because we conclude that there are genuine issues of material fact with respect to the sophistication of Gray and Smith Foundry and the adequacy of the warnings and instructions given by Badger Mining to Smith Foundry, we reverse the court of appeals.

Gray worked at Smith Foundry from 1951 until 1998, with the exception of a 2–year period in which he served in the infantry in Korea. Smith Foundry uses sand to create molds in which metal objects are cast. There is evidence that Badger Mining supplied sand[1] to Smith Foundry prior to 1981, and then again beginning in 1992. All of the sand was delivered by Badger Mining in bulk by pneumatic trucks.

Gray brought a products liability action against Badger Mining and other suppliers that manufactured and sold sand to Smith Foundry. Gray alleged that his repeated exposure to silica dust caused silicosis of the lungs. Gray's claims were based on negligence and strict liability for failure to warn and on breach of warranties of merchantability and fitness for the intended purpose.

Gray provided evidence that Badger Mining knew of special hazards involved in using sand for foundry processes. During the phase of the process where the sand mold is knocked off of the casting, the sand is pulverized to small sub-micron sized particles of dust. Gray points to several documents and to testimony of Badger Mining employees to show that Badger Mining had knowledge that conventional disposable respirators were ineffective to protect workers against the inhalation of sub-micron sized particles.

Badger Mining's Vice President and a member of its Health and Safety Committee, Timothy Wuest, was familiar with the 1992 recommendation of the National Industrial Sand Association that disposable respirators were "not recommended for routine use where exposure to respirable crystalline silica dust may occur." Wuest acknowledged that Badger Mining's safety director, Richard Chier, had conducted independent research in the early to mid 1980s and had determined that disposable respirators could not be used for an extended period of time because they did not provide a good seal. According to Wuest, Chier's conclusions caused Badger Mining to decide that disposable respirators would not be used by its own employees.

Richard Chier testified that, when customers asked, he recommended they use a double cartridge half-mask respirator. Badger Mining's Quality and Technical Assistance Director, Larry Beuthin, testified that he was familiar with the silica hazards of the foundry industry and that he would not use a disposable respirator for an extended period because it does not provide a good seal—"If you hold your hand over the paper mask while you're in there, you get a good seal. But if you're going to work with your hands, you do not get a good, tight seal around the edges of those fiber, paper masks."

---

1. Sand and silica are used interchangeably in this opinion. Both refer to crystalline silica, the dust of which has been found to cause silicosis of the lungs.

The parties offered differing views of the adequacy of the warnings and safety instructions that Badger Mining provided to Smith Foundry. Gray provided evidence that Badger Mining did not provide warnings or safety instructions with shipments made prior to 1981. When Badger Mining renewed its sales to Smith Foundry in 1992, its shipments were accompanied by warnings and safety instructions printed on a Material Safety Data Sheet ("MSDS") that was supplied pursuant to federal regulations known as the "Hazard Communication Standards." *See* 29 C.F.R. § 1910.1200 (2003). Although Wuest testified that the instructions on Badger Mining's MSDS specifically said that disposable respirators were not approved, the MSDS actually stated:

CONTAINS FREE SILICA, AVOID BREATHING DUST FROM THIS PRODUCT. PROLONGED EXPOSURE MAY CAUSE DELAYED LUNG INJURY (SILICOSIS). EXCESSIVE INHALATION OF DUST MAY RESULT IN RESPIRATORY DISEASE, INCLUDING SILICOSIS, PNEUMOCONIOSIS, AND OTHER PULMONARY FIBROSIS. THE INTERNATIONAL AGENCY FOR RESEARCH ON CANCER (IARC) HAS EVALUATED IN VOLUME 42, MONOGRAPHS ON THE EVALUATION OF THE CARCINOGENICITY RISK OF CHEMICALS TO HUMANS, SILICA AND SOME SILICATES (1987), THAT THERE IS "SUFFICIENT EVIDENCE FOR THE CARCINOGENICITY OF CRYSTALLINE SILICA TO EXPERIMENTAL ANIMALS" AND "LIMITED EVIDENCE" WITH RESPECT TO HUMANS.

The MSDS also instructed that, for "protective equipment," purchasers should "use NIOSH or MSHA approved dust respirators." Gray argues that this warning and the accompanying instructions were inadequate because disposable respirators are among the National Institute for Occupational Health and Safety (NIOSH) and Mine Safety and Health Administration (MSHA) approved respirators.

The parties also offered differing views of the level of knowledge possessed by Gray and Smith Foundry of the hazards of silica dust. Gray argues that Smith Foundry possessed only a general knowledge of the hazards of silica and lacked the special knowledge possessed by Badger Mining, that disposable respirators were ineffective. Gray also contends that he personally was unaware of the extent of the danger associated with breathing silica dust. Gray testified that he believed that he was protected by the disposable respirators provided by Smith Foundry.

Badger Mining argues that Gray had long been concerned with the dangers of breathing silica dust. Badger Mining also argues that Smith Foundry was aware of the dangers of silica through its involvement with the American Foundry Association (AFS) and the occupational health information it received from other industry bodies and from government agencies. Badger Mining argues that Smith Foundry's awareness of the dangers of silica dust is proven by the preventative actions it took, such as installing a dust collection system; monitoring air quality to ensure safe levels; providing respirators to its employees since the 1960s; and requiring yearly chest x-rays since the 1950s. Badger Mining also argues that Smith Foundry relied on 3M to provide respiratory protection and had the air quality of the workplace monitored by its insurance companies.

Each defendant filed a motion for summary judgment. Badger Mining's motion was on the grounds that it owed no duty to warn Gray because it sold raw material to

a sophisticated purchaser. The district court denied all motions. Prior to trial, Gray settled with all defendants except Badger Mining. After the district court denied Badger Mining's renewed summary judgment motion, the parties stipulated to the entry of judgment for Gray that would be either $17,500 or $75,000, depending on the outcome of this appeal. To enable Badger Mining to appeal the legal issues presented by its motion for summary judgment, the stipulation provided in part:

2. The judgment entered pursuant to this stipulation is intended to allow appellate resolution of legal issues. The judgment is not based upon an adjudication on the merits and shall have no collateral estoppel effect;

3. Defendant Badger Mining Corp.'s rights to appeal the trial court's denial of its motion for summary judgment are preserved as part of this agreement. Nothing herein is intended to waive, impair, or limit the rights of defendant Badger Mining Corp. to appeal, it being the intention of the parties to facilitate the appellate review without the need for further litigation;[2]

The court of appeals reversed the district court. *Gray v. Badger Mining Corp.*, 664 N.W.2d 881, 887 (Minn.App.2003). The court of appeals stated:

We find persuasive the reasoning in cases in the Eighth Circuit and other jurisdictions that have ruled on the applicability of the sophisticated-purchaser defense when a foundry employee who developed silicosis sued a silica sand supplier for failing to warn either the purchaser or employee. These industry-specific cases provide us with persuasive reasoning to support the legal conclusion that a bulk supplier of silica sand to a sophisticated purchaser has no duty to warn the user of the dangers of exposure to silica dust.

*Id.* at 886. The court of appeals did not reach the additional argument of Badger Mining that it had no duty to warn because of the "raw material/component part supplier" defense. *See id.* at 887.

We granted Gray's petition for review on the duty to warn and Badger Mining's petition for cross-review on the raw material/component part supplier defense.

## I.

Under this somewhat unusual stipulation for entry of judgment, the standard of review on this appeal is that applicable to the denial of a motion for summary judgment. Because the parties stipulated to the entry of judgment but not to any facts, and the district court did not make findings, a review of the case under a sufficiency of the evidence standard, normally applicable to an appeal from a judgment on the merits, is not possible. *See, e.g., Runia v. Marguth Agency, Inc.*, 437 N.W.2d 45, 48 (Minn.1989).

Given this scope of review, we will reinstate the judgment for Gray if any genuine issues of material fact exist as to any of the legal theories alleged in his complaint. *Denelsbeck v. Wells Fargo & Co.*, 666 N.W.2d 339, 345 (Minn.2003). For ease of analysis, we will consider Gray's claim of negligence and defer for another day the question of whether the various defenses raised by Badger Mining would apply to Gray's strict liability or breach of warranty claims.

2. Although the Rules of Civil Procedure do not specifically authorize the parties to preserve an issue for appeal by stipulating to the entry of judgment, the parties agreed to this procedure and the court of appeals accepted it. Because the propriety of this procedure has not been argued or preserved for appeal, we express no view concerning it.

## II.

Minnesota negligence law on a supplier's duty to warn is well developed. In general, a supplier has a duty to warn end users of a dangerous product if it is reasonably foreseeable that an injury could occur in its use. *Balder v. Haley,* 399 N.W.2d 77, 81 (Minn.1987). The duty to warn includes the duty to give adequate instructions for the safe use of the product. *Frey v. Montgomery Ward & Co.,* 258 N.W.2d 782, 787 (Minn.1977). This court has stated that "where the manufacturer or the seller of the product has actual or constructive knowledge of danger to users, the seller or manufacturer has a duty to give warnings of such dangers." *Id.* at 788 (citing *Hill v. Wilmington Chem. Corp.,* 279 Minn. 336, 156 N.W.2d 898 (1968)). To be legally adequate, the warning should (1) attract the attention of those that the product could harm; (2) explain the mechanism and mode of injury; and (3) provide instructions on ways to safely use the product to avoid injury. Carole A. Cheney, *Comment: Not Just for Doctors: Applying the Learned Intermediary Doctrine to the Relationship Between Chemical Manufacturers, Industrial Employers, and Employees,* 85 Nw. U.L.Rev. 562, 566 (1991). *See Hodder v. Goodyear Tire & Rubber Co.,* 426 N.W.2d 826, 834 (Minn. 1988); *Westerberg v. Sch. Dist. No. 792,* 276 Minn. 1, 5, 148 N.W.2d 312, 315 (1967).

In this context, we have endorsed the broad statement of principles contained in the Restatement (Second) of Torts § 388 (1965) with respect to suppliers of goods. *See Clark v. Rental Equip. Co.,* 300 Minn. 420, 427, 220 N.W.2d 507, 511 (1974) (paraphrasing the language of section 388 without citing the Restatement); *Mikel v. Aaker,* 256 Minn. 500, 504–05, 99 N.W.2d 76, 79–80 (1959) (quoting Restatement of Torts § 388 (1934), which is identical to Restatement (Second) of Torts § 388). According to section 388:

> One who supplies directly or through a third person a chattel for another to use, is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be in the vicinity of its probable use, for bodily harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier
>
> (a) knows, or from facts known to him should realize, that the chattel is or is likely to be dangerous for the use for which it is supplied;
>
> (b) and has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition; and
>
> (c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts, which make it likely to be so.

Restatement (Second) of Torts § 388.

In addition to the common law duty to warn, chemical suppliers are required by federal law to provide warnings if their products are hazardous.[3] Under federal regulations, suppliers such as Badger Mining must provide their customers with a MSDS that includes "[a]ny generally applicable precautions for safe handling and use which are known to the chemical manufacturer" and "[a]ny generally applicable control measures which are known to the chemical manufacturer, * * * such as appropriate engineering controls, work practices, or personal protective equipment."

---

3. "Chemicals" are defined as "any element, chemical compound or mixture of elements and/or compounds" and include the sand sold by Badger Mining to Smith Foundry. 29 C.F.R. § 1910.1200(c) (2003).

29 C.F.R. § 1910.1200(g)(2)(viii) & (ix) (2003).

■ The parties do not discuss the legal effect of this federal regulatory duty to warn, although Gray argues that Badger Mining's MSDS for silica does not meet the federal standard. In some contexts, we have held that the breach of a regulatory duty may be regarded as negligence per se. *See Engvall v. Soo Line R.R. Co.*, 632 N.W.2d 560, 569 (Minn.2001) (holding that a violation of a federal standard may be a basis for alleging negligence per se). In other contexts, we have held that conforming to a federal standard may not satisfy a manufacturer's duty to warn (unless state action is preempted explicitly or implicitly by the federal statute), but the failure to satisfy a federal standard may be used by a finder of fact as evidence of a breach of the duty to warn. *See Forster v. R.J. Reynolds Tobacco Co.*, 437 N.W.2d 655, 657 (Minn.1989); *see also* 10 Am. Law Prod. Liab.3d § 113:12 (John D. Hodson ed., 1995) ("A prima facie case of negligence may be established by the defendant's failure to comply with industry-wide standards of warning. In fact, exclusion of evidence that the product was not labeled in accordance with regulations may be highly prejudicial because violation of a statute and regulations under it is evidence of negligence.").

Because the parties provide no guidance as to the legal effect of the violation of this federal standard, we will not decide whether a violation is negligence per se but will only consider the federal standard as evidence relevant to the adequacy of Badger Mining's warnings and safety instructions.

## III.

■ Several potential defenses that could obviate or discharge the duty of a supplier to warn have been considered in the case law from other jurisdictions and in learned treatises. Although each defense has slightly different features, there is considerable overlap between them and they are often discussed interchangeably or in combination. We will refer to these potential defenses separately as the (1) learned intermediary; (2) sophisticated user; (3) sophisticated intermediary; (4) bulk supplier; and (5) raw material/component part supplier defenses.

Essentially, these defenses do not alter common law principles of negligence and causation but instead describe the application of those principles to various sets of common fact patterns. The first four are derived from the Restatement (Second) of Torts § 388. The fifth, the raw material/component supplier defense, is drawn from the Restatement (Third) of Torts: Products Liability § 5 (1998).[4]

### Learned Intermediary

In *Mulder v. Parke Davis & Co.*, 288 Minn. 332, 335–36, 181 N.W.2d 882, 885 (1970), we recognized that the learned intermediary defense was available in a

---

4. Section 5 states:

One engaged in the business of selling or otherwise distributing product components who sells or distributes a component is subject to liability for harm to persons or property caused by a product into which the component is integrated if:

(a) the component is defective in itself, as defined in this Chapter, and the defect causes the harm; or

(b)(1) the seller or distributor of the component substantially participates in the integration of the component into the design of the product; and

(b)(2) the integration of the component causes the product to be defective, as defined in this Chapter; and

(b)(3) the defect in the product causes the harm.

Restatement (Third) of Torts: Products Liability § 5.

claim for failure to warn of the dangers of a drug. By applying traditional common law causation principles, we concluded that the failure of a drug manufacturer to warn a physician of the dangers of a drug was not the proximate cause of the injury to the patient where the physician acknowledged that he was fully aware of its potentially dangerous effects. *Id.*

This learned intermediary defense has been recognized in other jurisdictions but has essentially been limited to pharmaceutical products. *See* 6 Am. Law Prod. Liab.3d § 89:10 (John D. Hodson ed., 2003). It also has been recognized by our court of appeals. *Todalen v. U.S. Chem. Co.*, 424 N.W.2d 73, 79 (Minn.App.1988), *overruled on other grounds by Tyroll v. Private Label Chems., Inc.*, 505 N.W.2d 54 (Minn.1993). We have applied similar reasoning, without citing *Mulder* or mentioning the learned intermediary defense by name, in another professional context. In *Minneapolis Soc'y of Fine Arts v. Parker-Klein*, 354 N.W.2d 816, 821–22 (Minn. 1984), *overruled on other grounds by Hapka v. Paquin Farms*, 458 N.W.2d 683, 687 (Minn.1990), we held that the manufacturer of bricks had no duty to instruct on the appropriate precautions to follow when installing them because "the evidence was overwhelming that the architects employed by [the plaintiff] should have known" of the necessary precautions.

Gray contends that the court of appeals incorrectly extended the learned intermediary defense to this industrial setting. This contention is incorrect, however, because, although the court of appeals mentioned *Mulder* and the learned intermedi-

ary defense, it ultimately analyzed the case under "sophisticated user" and "bulk supplier" defenses. *Gray,* 664 N.W.2d at 886–87. Further, Badger Mining does not argue before us for the application of the learned intermediary defense. On this record, we decline to extend the learned intermediary defense to the employer/employee relationship in the industrial context.[5]

### Sophisticated User

Under the sophisticated user defense, a supplier has no duty to warn the ultimate user if it has reason to believe that the user will realize its dangerous condition. As stated in *Hall v. Ashland Oil,* 625 F.Supp. 1515, 1520 (D.Conn.1986):

> [O]ne with a duty to warn is not liable for failing to warn a party of facts that the party already knew. The theory of this exception is that a failure to warn a party of a danger of which it was independently aware cannot be the proximate cause of injury resulting from that danger, since presumably the party would not have acted differently even if warned.

(Citations omitted.) *See also Donahue v. Phillips Petroleum Co.,* 866 F.2d 1008, 1012 (8th Cir.1989) (stating that the sophisticated user defense relieves a supplier from a duty to warn when the user knows or reasonably may be expected to know the particular dangers); *In re Hoffman,* 434 Mass. 624, 751 N.E.2d 848, 854 (2001) (same).

Although we have not addressed the sophisticated user defense by name, in *Hill v. Wilmington Chem. Corp.,* 279

---

5. The reasons for distinguishing between physicians as intermediaries and industrial employers as intermediaries were well summarized by the court of appeals in *Todalen,* 424 N.W.2d at 79 (quoting from *Hall v. Ashland Oil,* 625 F.Supp. 1515, 1519–20 (D.Conn.

1986)). The Eighth Circuit used the same reasoning to decline the extension of the learned intermediary defense to industrial environments. *See Donahue v. Phillips Petroleum Co.,* 866 F.2d 1008, 1013 (8th Cir.1989) (applying Missouri law).

Minn. 336, 340–44, 156 N.W.2d 898, 902–04 (1968), we recognized its fundamental principles. In *Hill*, we held that a supplier of dangerous chemicals had no duty to warn of the dangerous propensities of the chemical where those dangers were already known to the purchaser. *Id.* at 345, 156 N.W.2d at 904. Because the evidence was conclusive that the purchaser knew of the dangers, we held that the chemical supplier had no duty to warn. *Id.* "Under these circumstances, we think the trial court was correct in holding that any negligence of [the supplier] did not proximately cause the loss sustained by [the purchaser]." *Id.* at 344, 156 N.W.2d at 904.

The court of appeals has similarly held that a supplier may be legally free from a duty to warn the end user if the dangers of a product are within the knowledge of that user. *Todalen,* 424 N.W.2d at 80. *See also Strong v. E.I. Dupont De Nemours Co.,* 667 F.2d 682 (8th Cir.1981).

■ On the record before us, we need not determine the precise applicability or scope of the sophisticated user defense because there is evidence that Gray's knowledge was inferior to that of Badger Mining. There is no evidence that Gray was familiar with industry or government publications on the dangers of silicosis. His general knowledge of the risk was little more than the intuitive sense of danger from experiencing dust in the foundry environment. More specifically, there is no evidence that he knew that disposable respirators were ineffective in preventing silicosis in a foundry environment.[6]

Because there is evidence that Badger Mining had greater general knowledge of the dangers of the use of silica in the foundry process and had specific knowledge of the ineffectiveness of disposable respirators, it cannot be said as a matter of law that Gray's knowledge was sufficient to relieve Badger Mining of its duty to warn. At a minimum, there are genuine issues of material fact that preclude summary judgment on the question of whether Gray was a sophisticated user.

### Sophisticated Intermediary

In circumstances where it is highly impractical for the supplier to provide a warning directly to the end user, a variation of the sophisticated user defense has been developed that focuses on the sophistication of the end user's employer, on the premise that the employer will act in the best interest of its employees. For ease of analysis, we will refer to this as a separate "sophisticated intermediary" defense. It is often joined with the "bulk supplier" defense because bulk delivery presents one circumstance where direct warnings are impractical.

Under the sophisticated intermediary defense, some courts have held that a product supplier has no duty to warn the ultimate user where either of two situations is present: (1) the end user's employer already has a full range of knowledge of the dangers, equal to that of the supplier or (2) the supplier makes the employer knowledgeable by providing adequate

---

6. Comment k to section 388 of the Restatement (Second) emphasizes the importance of special knowledge of the supplier, stating that a dangerous condition

> may be one which only persons of special experience would realize to be dangerous. In such case, if the supplier, having such special experience, knows that the condition involves danger and has no reason to

believe that those who use it will have such special experience as will enable them to perceive the danger, he is required to inform them of the risk of which he himself knows and which he has no reason to suppose that they will realize.

Restatement (Second) of Torts § 388 cmt. k (1965).

warnings and safety instructions to the employer. *See, e.g.,* 3 Am. Law Prod. Liab.3d § 33.22 (Matthew J. Caravan ed., 1993); *Ritchie v. Glidden Co.,* 242 F.3d 713, 725 (7th Cir.2001); *Smith v. Walter C. Best, Inc.,* 927 F.2d 736, 742 (3d Cir.1990).

■ Although the sophisticated intermediary defense has characteristics similar to the learned intermediary defense, the sophisticated intermediary defense is generally only available where the supplier can show that it used reasonable care in relying upon the intermediary to give the warning to the end user. As explained in comment n to section 388 of the Restatement (Second), such a showing requires consideration of the purpose for which the product is to be used, the magnitude of the risk, the burden of providing direct warnings to end users and the reliability of the intermediary as a conduit. Restatement (Second) of Torts § 388 cmt. n (1965).

Some courts have been reluctant to extend the rationale of the sophisticated user defense to sophisticated intermediaries. *See, e.g., Little v. Liquid Air Corp.,* 952 F.2d 841, 851 (5th Cir.1992), *rev'd en banc,* 37 F.3d 1069 (5th Cir.1994); *Donahue v. Phillips Petroleum Co.,* 866 F.2d at 1013. But several courts have recognized the defense, particularly when it arises in combination with the bulk supplier defense, because of the significant burden on the supplier of giving a warning directly to end users. *See Hegna v. E.I. duPont de Nemours & Co.,* 806 F.Supp. 822 (D.Minn. 1992); 3 Am. Law Prod. Liab.3d § 33.28.

In *Kennedy v. Mobay Corp.,* the court provided a good overview of this defense:

> Part of the problem that may lead some to look askance at [the sophisticated intermediary] defense is in the language that some courts have used to describe it, in particular the notion that, where the elements or prerequisites of it exist, the supplier is absolved of any duty to warn ultimate users. That notion is not only unnecessary to the defense but in fact is inconsistent with the rationale of comment n to Restatement 388. There *is* a duty to warn of defects or propensities that make a product hazardous, and that duty *does* extend ordinarily to those who may reasonably be expected to use or come into harmful contact with the product. It is *not* a duty, we think, from which the supplier can be entirely *absolved.* The question, rather, is, what conduct will suffice to discharge that duty?
>
> Viewed in that context, the defense is not only logical but necessary. Where it is impracticable for the supplier to give adequate warnings directly to all who may use or come into contact with the product, some substitute for such direct warnings is required, even in strict liability cases. Otherwise, * * * strict liability would become in effect, absolute liability. As comment n to Restatement 388 makes clear, the focus remains on the conduct of the supplier, but that conduct is judged in light of the circumstances. Among those circumstances are the feasibility of giving direct warnings to all who are entitled to them and, where that is not feasible, whether the supplier acted in a manner reasonably calculated to assure either that the necessary information would be passed on to the ultimate handlers of the product or that their safety would otherwise be attended to. In such a situation, that is all that reasonably can be asked and it is all we think, that the law requires.

84 Md.App. 397, 579 A.2d 1191, 1199 (1990), *aff'd,* 325 Md. 385, 601 A.2d 123 (1992).

■ On this record, we need not decide the full applicability or scope of the sophisticated intermediary defense because, even if applicable, there are genuine

issues of material fact that preclude summary judgment. As noted earlier, Badger Mining did provide Smith Foundry with a general warning of the dangers of silicosis but it did not warn Smith Foundry about the ineffectiveness of disposable respirators or instruct that only high efficiency respirators be used. Further, it can be argued that Badger Mining's warning falls short of the federal requirement that it include precautions "known to the chemical manufacturer," including those concerning "personal protection equipment." 29 C.F.R. § 1910.1200 (2003). Generally, the adequacy of a warning is a fact question for the jury. *Balder v. Haley*, 399 N.W.2d 77, 81 (Minn.1987). Under these facts, we conclude that any question about the adequacy of Badger Mining's warning is for the jury.

Badger Mining also presented evidence of the general knowledge of Smith Foundry and the information that was available to Smith Foundry from government and industry publications, other sand suppliers and the suppliers of respirators. This included government publications on health and safety, testing results and information on air quality from safety consultants, publications from trade organizations, most notably the American Foundrymen's Society, and MSDSs from other suppliers that furnished materials to the foundry. But this evidence cannot be said to conclusively establish that Smith Foundry's knowledge was equal to that of Badger Mining. And, even if we were to conclude that Smith Foundry should have known as much as Badger Mining about the general risks of silica in foundry operations, there is no evidence that Smith Foundry shared in the special knowledge possessed by Badger Mining that disposable respirators were

ineffective. Stated conversely, there is no evidence that Badger Mining had reason to believe that Smith Foundry had such special knowledge.

These facts make this case distinguishable from the line of cases relied upon by the court of appeals that have held that suppliers of silica had no duty to warn injured foundry workers of the risk of silica dust because their foundry employer was a sophisticated user of silica and could be relied upon to protect its own employees. In *Bergfeld v. Unimin Corp.*, 319 F.3d 350, 354 (8th Cir.2003), *Smith v. Walter C. Best, Inc.*, 927 F.2d 736, 741 (3d Cir.1990), and *Goodbar v. Whitehead Bros.*, 591 F.Supp. 552, 561 (W.D.Va.1984), *aff'd sub nom. Beale v. Hardy*, 769 F.2d 213 (4th Cir.1985), the evidence showed that the foundry possessed equal or greater knowledge of the dangers than the silica suppliers. There was no evidence in any of these cases that the silica suppliers had special knowledge, not shared by the foundry employers, of the ineffectiveness of disposable respirators in foundry operations.[7] *See Bergfeld*, 319 F.3d at 354, *Smith*, 927 F.2d at 741, and *Goodbar*, 591 F.Supp. at 561.

The present case can also be distinguished from *Haase v. Badger Mining Corp.*, 266 Wis.2d 970, 669 N.W.2d 737 (2003). In *Haase*, the court granted summary judgment to Badger Mining where two of the foundry's employees testified that they were fully aware of the dangers of silica, had kept abreast of all new health and safety developments with respect to the use of foundry grade sand, and never relied on information from Badger Mining in determining the proper safety equipment to use in their operations. *Id.* at 740–41. In the present case, Smith

---

7. Even under the learned intermediary defense, we have held that a drug manufacturer is not relieved of a duty to warn the patient when its instructions to the physician are inadequate. *Lhotka v. Larson*, 307 Minn. 121, 124–25, 238 N.W.2d 870, 873–74 (1976).

Foundry employees did not disclaim their reliance on the warnings and safety instructions provided by Badger Mining. In fact, a safety director for Smith Foundry testified that he made the supplier's MSDSs available immediately to the employees and that any new information that was included on a MSDS, "particularly in response to silica exposure," would have been verbally relayed to the employees during a training session.

Given this evidence, there are genuine issues of material fact as to whether Smith Foundry relied on Badger Mining's product information in making its safety recommendations to its employees. In such circumstances, the issue of reliance would best be left for a jury determination. *See Balder*, 399 N.W.2d. at 81. Thus, this case is more analogous to the decisions of other jurisdictions that have denied summary judgment to silica suppliers. *See White v. W.G.M. Safety Corp.*, 707 F.Supp. 544, 548 (S.D.Ga.1988) (denying summary judgment for suppliers because the "existence of the employer's independent duty does not provide an absolute defense for [the supplier]"); *U.S. Silica v. Tompkins*, 92 S.W.3d 605, 609 (Tex.App.2002) (affirming district court's judgment for plaintiff and holding that the sophisticated intermediary defense did not apply because the employer could not be considered sophisticated and the supplier had taken no action to determine the sophistication of the employer); *Humble Sand & Gravel, Inc. v. Gomez*, 48 S.W.3d 487, 497 (Tex.App.2001) (affirming district court's judgment for plaintiff and holding that the supplier had not met the threshold to assert the sophisticated intermediary defense because the supplier had not passed on its full knowledge to the employer).

### Bulk Supplier

 The bulk supplier defense also originates from section 388 of the Restate-

ment (Second) and essentially is a specialized version of the sophisticated intermediary defense. *See* Restatement (Second) of Torts § 388. According to this defense, because of the difficulty in reaching the end user, the supplier of a material that is delivered in bulk can discharge its duty to warn the end user by warning the buyer of the dangerous condition of the materials. *See In re Hoffman*, 434 Mass. 624, 751 N.E.2d 848, 854–55 (2001); 3 Am. Law Prod. Liab.3d § 33:28 (Matthew J. Caravan ed., 1993). This defense is consistent with the federal regulation of hazardous chemicals, which requires the manufacturer to provide warnings to its purchasers in sales documents and MSDSs. *See* 29 C.F.R. § 1910.1200(f) & (g) (2003).

 Because Badger Mining delivers its product by trucks in bulk, requiring Badger Mining to directly warn every employee of the potential risks involved with its product would be exceedingly costly and in some cases impossible. Thus, we recognize that Badger Mining likely established the predicate for the application of the bulk supplier defense. But the same arguments that applied to the sophisticated intermediary defense can be made as to why the bulk supplier defense raises genuine issues of material fact. It would not be reasonable for a bulk supplier to rely on the employer to warn its employees where the bulk supplier has not provided an adequate warning to the employer. Thus, the existence of fact issues concerning the adequacy of the warning in Badger Mining's MSDS prevents summary judgment on the bulk supplier defense.

### The Raw Materials/Component Product Supplier Defense

 The Restatement (Third) of Torts: Products Liability § 5 (1998) identifies an additional defense to suppliers of inherent-

ly safe raw materials that are used as a component in a final product. According to the Restatement (Third), a supplier of a raw material should not be held liable when its product is integrated as a component into a finished product if the component itself is not dangerous.

> [W]hen a sophisticated buyer integrates a component into another product, the component seller owes no duty to warn either the immediate buyer or the ultimate consumers of dangers arising because the component is *unsuited* for the special purpose to which the buyer puts it.

Restatement (Third) of Torts: Products Liability § 5 cmt. b (emphasis added).

Badger Mining argues that because it sells a raw material that is not dangerous at the time of sale and that can be put to multiple uses, Badger Mining should not have a legal duty to warn against the multiple ways in which its product could become dangerous. Badger Mining cites two cases to demonstrate that the raw material/component parts supplier defense should apply in this situation.

In *In re TMJ Implants Products Liability Litigation*, 872 F.Supp. 1019, 1025 (D.Minn.1995), the court held that the supplier was not liable for failing to warn when its raw product was used as a component in surgical implants that later caused an injury to the implant patient. The court noted that the defendant's material had multiple industrial uses and that "[t]o require manufacturers of such 'building block' materials to guarantee the safety of their products for each and every

possible use would impose an unbearable burden on those manufacturers." *Id.* at 1026. In *Cimino v. Raymark Industries, Inc.*, 151 F.3d 297, 335 (5th Cir.1998), the court reached the same conclusion where the raw material was asbestos that was supplied to a manufacturer who incorporated it into insulating sheets that were sold to end consumers.

 Although sand is a raw material and is not inherently dangerous, it is nevertheless dangerous when used in a foundry process. Badger specifically develops sand for foundry use and has conceded that it understands the manner in which silica is used in the foundry process. More importantly, the sand is not used as a component of a finished product, and it is the sand—not the finished product—that is dangerous to foundry workers.

 Even where this defense is applicable, the supplier must still provide an adequate warning to the intermediate purchaser.[8] If the manufacturer has superior knowledge, it has a duty to relay that information to the intermediate purchaser. *Hill v. Wilmington Chem. Corp.*, 279 Minn. 336, 344, 156 N.W.2d 898, 904 (1968). In this case, there is evidence that Badger Mining did not adequately relay information on the recommended respirators to Smith Foundry.

### IV.

Our decision is limited by the unique procedural posture of this case and the particular facts in the record. Because genuine issues of material fact precluded the district court from deciding, as a mat-

---

8. The Restatement (Third) notes that:

 Courts have not yet confronted the question of whether, in combination, factors such as the component purchaser's lack of expertise and ignorance of the risks of integrating the component into the purchaser's product, and the component supplier's knowledge of both the relevant risks and the purchaser's ignorance thereof, give rise to a duty on the part of the component supplier to warn of risks attending integration of the component into the purchaser's product.

 Restatement (Third) of Torts: Products Liability § 5, cmt.b.

ter of law, that Badger Mining had no duty to warn or that its warning to Smith Foundry discharged its duty, the district court did not err in denying summary judgment. Accordingly, we reverse the court of appeals and reinstate the district court's judgment.

Reversed.