Rick GLORVIGEN, as Trustee for the next of kin of decedent James Kosak, Appellant,

Thomas M. Gartland, as Trustee for the next of kin of decedent Gary R. Prokop, Appellant,

v.

CIRRUS DESIGN CORPORATION, Respondent,

Estate of Gary Prokop, by and through Katherine Prokop as Personal Representative, Appellant,

University of North Dakota Aerospace Foundation, Respondent.

Nos. A10–1242, A10–1243, A10–1246, A10–1247.

Supreme Court of Minnesota.

July 18, 2012.

See also, 2009 WL 1806744.

Philip Sieff, Vincent J. Moccio, Robins, Kaplan, Miller & Ciresi, L.L.P., Minneapolis, MN, for appellant Glorvigen.

Sam Hanson, Diane B. Bratvold, Briggs and Morgan, P.A., Minneapolis, MN; and Edward J. Matonich, Darrold E. Persson, David Arndt, Matonich & Persson, Chartered, Hibbing, MN, for appellant Gartland.

Bruce Jones, Daniel J. Connolly, Daniel J. Herber, Faegre & Benson LLP, Minneapolis, MN; and Patrick E. Bradley, Reed Smith, LLP, Princeton, NJ, for respondent Cirrus Design Corporation.

Timothy R. Schupp, Robert W. Vaccaro, Gaskins, Bennett, Birrell, Schupp, L.L.P., Minneapolis, MN, for appellant Estate of Prokop.

Charles E. Lundberg, Steven P. Aggergaard, Bassford Remele, A Professional Association, Minneapolis, MN; and William J. Katt, Leib & Katt, LLC, Milwaukee, WI, for respondent University of North Dakota Aerospace Foundation.

Lori Swanson, Attorney General, Alan I. Gilbert, Solicitor General, John S. Garry, Assistant Attorney General, Saint Paul, MN, for amicus curiae State of Minnesota.

Wilbur W. Fluegel, Fluegel Law Office, Minneapolis, MN, for amicus curiae Minnesota Association for Justice.

Mark B. Rotenberg, General Counsel, William P. Donohue, Deputy General Counsel, University of Minnesota, Minneapolis, MN, for amicus curiae Regents of the University of Minnesota.

Mark S. Olson, Michael J. Vanselow, Mark Schneebeck, Oppenheimer Wolff & Donnelly LLP, Minneapolis, MN; and Hugh F. Young, Jr., Product Liability Advisory Council, Reston, VA, for amicus curiae Product Liability Advisory Council, Inc.

William M. Hart, Damon L. Highly, Meagher & Geer P.L.L.P., Minneapolis, MN, for amici curiae Minnesota Private College Council, Minnesota Career College

Association, and Minnesota Defense Lawyers Association.

Robert J. Hajek, Hajek & Beauclaire, LLC, Minnetonka, MN; and Kenneth M. Mead, Baker Botts, L.L.P., Washington, DC; and Ronald D. Golden, Raymond C. Speciale, Yodice Associates, Frederick, MD, for amicus curiae Aircraft Owners and Pilots Association.

## OPINION

### ANDERSON, G. BARRY, Justice.

This case requires our court to decide whether an airplane manufacturer owed a duty to a noncommercial pilot who, after purchasing an airplane from the manufacturer but failing to receive all of the flight training promised to him as part of that purchase, died when his airplane crashed. Gary R. Prokop and his passenger, James Kosak, died when Prokop's Cirrus SR22 airplane crashed near Hill City. Prokop had purchased the SR22 just 1 month before the crash. As part of the purchase of the SR22, Cirrus provided a training program for new owners. That training program was designed to help already-licensed pilots transition into the SR22. One of the program's lessons detailed how to recover from a specific emergency situation while flying the SR22. Prokop never received this lesson, and he was attempting to recover from that emergency situation when he crashed.

Following the crash, Rick Glorvigen, as trustee for the next of kin of Kosak, commenced an action against Cirrus and Prokop's estate in Itasca County District Court. Thomas M. Gartland, as trustee for the next of kin of Prokop, also commenced an action against Cirrus in Itasca County District Court. Glorvigen and Gartland alleged that Cirrus, as a manufacturer and seller, breached its duty to warn and to provide adequate instructions for the safe use of its airplanes. Cirrus sought indemnity from the University of North Dakota Aerospace Foundation (UNDAF), with whom Cirrus had contracted to provide the training to new owners. UNDAF subsequently intervened in the case.

The district court combined the two cases. At trial, the jury found Cirrus, UNDAF, and Prokop negligent. Cirrus and UNDAF made motions for judgment as a matter of law, which the district court denied. Cirrus and UNDAF appealed. The court of appeals reversed the district court, concluding that Cirrus did not have a duty to provide training and that the claims were barred by the educational malpractice doctrine. Glorvigen, Gartland, and Prokop's estate petitioned our court for review. On appeal, the parties raise four primary issues: (1) whether Cirrus owed a duty, (2) whether the negligence claim against Cirrus and UNDAF is barred by the educational malpractice doctrine, (3) whether the evidence presented at trial was legally sufficient to support the jury's finding on causation, and (4) whether UNDAF can be held liable as an intervenor. Because we conclude that Cirrus did not owe a duty to Prokop or Kosak, we affirm.

### Cirrus SR22 Purchase

In December 2002 Gary R. Prokop, a licensed pilot, purchased a Cirrus SR22 airplane. The SR22 was Prokop's second airplane. Before purchasing the SR22, he owned and flew a 1968 Cessna 172 Sky Hawk, logging at least 200 hours of flight time over the course of 2 years in the Cessna.

It is undisputed that piloting the Cessna is different than piloting the SR22. Cirrus had incorporated into the SR22 "several features that [were] uncommon or entirely new to certified general aviation aircraft." Because of these features, the SR22 was more sophisticated and powerful than the Cessna. For example—and most important here—the SR22 had an autopilot func-

tion and the Cessna did not. Captain James M. Walters, an expert airplane accident investigator, testified at trial about the significance of an autopilot. According to Captain Walters,

> an autopilot will do a lot of good things for the pilot of an aircraft depending on the capabilities of that particular autopilot and this one [in the SR22] is a very good one. In its most basically [sic] form it will keep the wings level.
>
> It will also maintain a heading across the ground and it will maintain altitude if it's all program[m]ed properly to do that.

The SR22 also had an advanced GPS system and travelled at a cruising speed of 180 knots, one-third times faster than the Cessna. Finally, the Federal Aviation Administration (FAA) requires most pilots, including Prokop, to earn a "high performance endorsement" before flying the SR22.

Despite the special qualifications required to fly the SR22, Cirrus marketed the airplane to "pilots with a wide range of experience." To "facilitate[a] pilot's transition to the SR22," Cirrus provided a "two-day, new-owner training program" as part of the purchase price of the airplane. Cirrus described the training program in a document provided to new owners called the "Pilot Training Agreement." Cirrus also provided other written materials to new owners, including a Cirrus SR22 Training Manual, an FAA-approved Pilot's Operating Handbook, and a separate Autopilot Pilot's Operating Handbook. As a new owner, Prokop received all of these resources when he purchased the SR22.

*Transition Training*

It is standard in the general aviation industry to provide "transition training" to already-licensed pilots who plan to fly a new or unfamiliar airplane. Transition training builds on the pilot's previous experience and "give[s the pilot] extensive[, individualized] training" in the new airplane, "teach[ing the pilot] the differences" between the previous airplane and the new airplane. A pilot is trained to "proficiency" when the pilot can "continually repeat whatever it is that he is expected to do in a proficient manner."

As noted earlier, Cirrus provided transition training as part of the purchase price of the SR22. In the past, Cirrus had contracted with the Wings Aloft flight school to provide transition training to new owners. Then, from October 2001 to July 2002, Cirrus provided transition training to new owners directly. But by the time Prokop purchased his SR22, Cirrus had contracted with the UNDAF flight school—an entity separate from the University of North Dakota[1]—to provide transition training.

Prokop purchased his SR22 and registered for transition training in December 2002. The Cirrus SR22 Training Manual outlined the 2–day transition training Prokop was to receive. Cirrus explained that the purpose of the training program

> [was] to build on the pilot's existing knowledge and experience, by reviewing the systems and procedures of the SR22, and by paying close attention to those areas that may be new to many pilots and owners.
>
> At the completion of the training, pilots should feel confident and comfortable with the operation of their new aircraft.

The training consisted of five separate sessions. In each session, the new owner would receive a lesson on the ground previewing certain in-flight maneuvers and

**1.** UNDAF describes itself as "a public, non-profit corporation serving the business arm between the aerospace industry and the John D. Odegard School of Aerospace Sciences at the University of North Dakota."

concerns. Following each ground lesson, the owner would then participate in an in-flight lesson in which he would review in the air what he had just learned on the ground.[2]

As the new owner completed each round of ground and in-flight lessons, the UNDAF instructor would check off the ground lessons, and the tasks and maneuvers the owner completed in the air, on a corresponding syllabus. At the same time, the instructor would grade the owner's performance by placing the check mark under "U" for "unsatisfactory," "M" for "marginal," "S" for "satisfactory," and "E" for "excellent." The syllabus explained that "[s]kipped items should be left unchecked," though "[a] maneuver in which a U or M grade is posted may be discontinued and remain incomplete at the instructor's discretion." In order to receive a completion certificate, however, the owner had to complete all maneuvers in the Final Evaluation Flight earning an S or E grade.

At the time Prokop purchased the SR22 and began training, he was licensed only to fly in "visual flight rule," or VFR conditions.[3] VFR conditions are weather conditions in which "visibility is three miles or greater" and the pilot is able to see the ground. Because Prokop was only VFR licensed, he could not legally fly in "instrument meteorological conditions," or IMC. In IMC, a pilot is deprived of visual ground references and must rely on instruments to fly the airplane.

Cirrus noted in its training manual that inadvertently entering IMC, a circumstance known as "VFR into IMC," is an emergency situation. The emergency arises because the pilot experiences spatial disorientation, which is a disagreement between the pilot's senses and the pilot's visual cues. Captain Walters explained:

> Basically [spatial] disorientation is when your mind perceives something different in terms of your relationship with the earth.... Your mind thinks it's climbing or descending or turning when, in fact, it may not be or in fact [may be] just the opposite.
>
> It's a disagreement in simple terms in terms of what your senses are feeling, your senses are essentially your ear, your inner ear is a big one ... [it's] what we would call flying by the seat of your pants, you know, how that feels. So when you don't agree you have a real problem, you don't know which one to believe, and typically you tend to believe the visual one which isn't what you should believe....

Spatial disorientation caused by VFR into IMC is a leading cause of small plane crashes. In the SR22, the correct procedure to follow upon entering inadvertent IMC is to activate the autopilot.

Cirrus provided Prokop with information, in a variety of formats, about using the autopilot to recover from VFR into IMC in the SR22. First, the Pilot's Operating Handbook and Autopilot Pilot's Operating Handbook explained how to use the autopilot, and the Cirrus SR22 Training Manual included diagrams about coping with inadvertent IMC. Second, Prokop watched PowerPoint slides about the autopilot and recovering from VFR into IMC during a ground lesson. Finally, the training syllabus indicates that in Flight Lesson

---

**2.** In addition to the 2–day transition training, Prokop contracted for 2 days of supplementary training. He also sought a "high-performance aircraft endorsement" and an "instrument competency check" through the training.

**3.** Prokop lacked an instrument rating, which would have qualified him to fly in conditions other than VFR.

4a, Prokop was supposed to practice a maneuver called "Recovery from VFR into IMC (auto-pilot assisted)." Flight Lesson 4a is at the heart of this case.

Prokop arrived for training in Duluth on December 9, 2002. Prokop's UNDAF instructor was Yu Weng Shipek. It appears from the record that Prokop's training began in keeping with the process discussed earlier: each time Prokop completed a ground lesson or in-flight maneuver, Shipek placed a corresponding check mark next to the lesson or maneuver on the syllabus.[4] The majority of the maneuvers listed on the syllabus have a corresponding check mark. But none of the maneuvers under Flight Lesson 4a have a corresponding check mark. According to the syllabus, that omission indicates that the maneuvers were either skipped or left incomplete at Shipek's discretion.

Flight Lesson 4a was titled "IFR[5] Flight (non-rated)" and was supposed to follow a ground lesson titled "VFR into IMC Procedures." Flight Lesson 4a is generally taught "under the hood." In "under the hood" lessons, a new owner wears a hood over his head so that he cannot use visual cues outside the airplane. In Flight Lesson 4a, the owner is supposed to activate the autopilot and make a 180 degree turn, as if exiting inadvertent IMC, while wearing the hood. Shipek testified that he gave Flight Lesson 4a to Prokop but failed to document it on the syllabus. But neither the syllabus nor Prokop's log books confirm that the lesson was completed.

Evidence was presented at trial emphasizing the importance of learning to activate the autopilot while in flight. For example, John Wahlberg, UNDAF's director of transition training at the Cirrus facility, testified that autopilot-assisted re-covery is "the safest maneuver" during VFR into IMC, but that "in order for this training to take, in order for training to be effective, you can't just do it on the ground.... It has to be done up in the sky with the pilot." Wahlberg also agreed that the speed at which an SR22 can travel complicates the recovery because it requires a fast response from the pilot, increasing the importance that the pilot is able to execute the recovery procedure quickly, or the pilot "may die." Further, Captain Walters testified that skipping an in-flight lesson on recovery from VFR into IMC did not meet industry standards.

*Airplane Crash*

On January 18, 2003, Prokop and his friend and passenger James Kosak intended to fly from Grand Rapids to Saint Cloud to watch their sons play in an early-morning hockey game. To determine whether weather conditions were safe to fly in, Prokop called FAA weather briefers twice. When Prokop called the FAA at 4:56 a.m., the briefer told Prokop that there was "potential for some IFR" and "occasional moderate turbulence." Prokop called the FAA again around 5:45 a.m. This time the briefer told Prokop there were "marginal" conditions around Grand Rapids. Prokop told the briefer he was "hoping to slide underneath [the conditions] and then climb out." Captain Walters testified that while these conditions were not ideal for flying, Prokop could fly legally under these circumstances.

Around 6:30 a.m., while it was still dark outside, Prokop and Kosak departed from the Grand Rapids airport in Prokop's SR22. The flight began in VFR conditions. According to Captain Walters, Prokop started the flight by taking off to the

---

4. Prokop received "Satisfactory" grades on his maneuvers.

5. "IFR" appears to stand for "Instrument Flight Rating," which relates to the flying and navigating of an airplane using only instruments.

northwest. Soon after the takeoff, Prokop encountered turbulence. Because Prokop was likely "being bumped around like crazy," Captain Walters said he believed that Prokop "[made] a decision. He [said], this is lousy, I'm going home." But before Prokop could safely begin his route home, he entered IMC-like conditions and became spatially disoriented. Captain Walters explained:

> He's not an instrument rated pilot. He's in a really uncomfortable position. He can't see the horizon, it's dark, there's very few lights to navigate by but he wants to go home.

Walters stated that Prokop struggled to maintain appropriate altitude and control of the angle of the airplane due to his spatial disorientation. Eventually the SR22 entered an accelerated stall.[6] Captain Walters testified that the accelerated stall

> was a sudden event.

> It wasn't something that was expected because it happened at a speed that was faster than he expected. It happened at an altitude of the airplane that was different than expected, so it was a surprising event.

After the airplane entered the accelerated stall, Prokop lost control of the airplane. The airplane then "rapidly descended to the ground," killing both Prokop and Kosak.

Captain Walters testified that the entrance into "IMC-like conditions" triggered the crash: "Had [Prokop] been able to recover during those IMC-like conditions certainly the accident would not have happened." Captain Walters also testified that Prokop had not activated the autopilot at all during the flight. Finally, Captain Walters testified to "three root[ ] causes" of the crash: (1) "Prokop made a poor

decision [to go flying]," (2) "Prokop was not given the tools that he needed to make an appropriate decision," and (3) Prokop was not "given the proper tools to be able to recover from that event."

*Litigation*

In July 2005 Rick Glorvigen, as trustee for the next of kin of Kosak, commenced an action against both Cirrus and Prokop's estate. Glorvigen alleged negligence and breach of an implied warranty of merchantability against Cirrus, and alleged negligent piloting against Prokop's estate. At the same time, Thomas M. Gartland, as trustee for the next of kin of Prokop, also brought a wrongful death action against Cirrus alleging negligence and various products liability claims. The negligence claims of both Glorvigen and Gartland alleged that Cirrus had a duty to train Prokop by virtue of including transition training as part of the purchase price of the SR22.

In September 2005 Cirrus removed the two cases to federal district court, arguing that FAA regulations preempted state law claims. The court rejected Cirrus's claims and remanded both cases to state court. On remand, the state district court "consolidated the actions for purposes of discovery and trial."

Cirrus subsequently brought a third-party action against employees of the FAA. The FAA responded to the third-party action by removing the cases to federal district court. Cirrus then sought summary judgment in the federal district court. In February 2008 the court granted Cirrus's motions for summary judgment on claims of strict liability and breach of implied and express warranty. But the court denied Cirrus's motions for

---

6. An accelerated stall occurs when there is not enough air moving across the airplane's wing to keep the airplane aloft.

summary judgment on the claim of preemption and, notably, on the claim of negligence. The federal district court then remanded the cases to state court.

In September 2008 UNDAF intervened. UNDAF asserted that it hoped "to control the strategy of and to present its own defense for any claims for which UNDAF may have indemnity liability under the indemnity agreement between UNDAF and Cirrus." UNDAF also submitted answers to the complaints brought by Glorvigen and Gartland against Cirrus. Meanwhile, Cirrus appealed the federal district court's remand of the cases to the state court to the Eighth Circuit, which affirmed the federal district court. *Glorvigen v. Cirrus Design Corp.*, 581 F.3d 737 (8th Cir.2009).

Finally, in May 2009 the combined remaining claims of Glorvigen and Gartland were tried to a state court jury. At the close of trial, the district court submitted a special verdict form to the jury. The special verdict form asked the jury to consider whether Cirrus, UNDAF, and Prokop were (1) negligent, and if so (2) whether that negligence was a direct cause of the crash. The special verdict form also asked whether UNDAF had acted as an agent for Cirrus at the time of Prokop's training, and whether Cirrus and UNDAF had acted in a joint enterprise. The jury answered "yes" to all of the questions presented and found Cirrus 37.5 percent negligent, UNDAF 37.5 percent negligent, and Prokop 25 percent negligent. The jury awarded Glorvigen (on behalf of Kosak) $7,400,000 in damages and Gartland (on behalf of Prokop) $12,000,000 in damages.

Cirrus and UNDAF brought motions for (1) judgment as a matter of law, (2) a new trial, and (3) amendment of the findings of fact, conclusions of law, order for judgment, and judgment. The district court denied the motions for judgment as a matter of law and for a new trial. The court granted the motions for amendment of findings of fact, conclusions of law, order for judgment and judgment.

Cirrus and UNDAF appealed the district court's denial of their motions for judgment as a matter of law. *Glorvigen v. Cirrus Design Corp.*, 796 N.W.2d 541 (Minn.App.2011). A divided panel of the court of appeals concluded that Cirrus and UNDAF were not liable as a matter of law because Cirrus's duty to warn did not include a duty to provide pilot training, and because the negligence claim was barred by the educational malpractice doctrine. *Id.* at 552–58. The dissent concluded that "the majority's view of this case depends on weighing the facts found by the jury in a light unfavorable to its verdict, sidestepping settled principles of negligence law while expanding the educational-malpractice doctrine." *Id.* at 561 (Klaphake, J., dissenting). We granted review of the claims of Glorvigen, Gartland, and Prokop's estate, and also granted the conditional petition for further review brought by UNDAF.

On appeal, appellants Glorvigen, Gartland, and Prokop's estate argue that they submitted a products liability claim based on a theory of negligence at trial, and that the jury's verdict in their favor should not be overturned. First, appellants contend that Cirrus and UNDAF owed a duty to Prokop and Kosak to give Flight Lesson 4a because, as a supplier and manufacturer, Cirrus owed a duty to give adequate instructions in the safe use of its airplane. Second, appellants contend that even if Cirrus did not owe a duty to give Flight Lesson 4a as part of its duty to give adequate instructions, Cirrus assumed a duty to provide Flight Lesson 4a when it undertook to provide the lesson as part of the purchase price of the SR22. Under either theory, appellants contend that the

jury found that Cirrus breached its duty by failing to provide Flight Lesson 4a and that the district court's denial of judgment as a matter of law ("JMOL") was appropriate.

Cirrus argues that it did not owe a duty to train Prokop and thus appellants' products liability claim fails. First, Cirrus contends that it properly discharged its duty to give adequate instructions through the written instructions provided to Prokop. Second, Cirrus contends that it could not assume a duty in tort to provide Flight Lesson 4a because any such duty arose out of the contract with Prokop. Additionally, Cirrus contends that even if it owed a duty to provide Flight Lesson 4a, the educational malpractice doctrine bars appellants' claim, and that appellants did not establish causation at trial.

UNDAF argues that it owed no relevant duty to Prokop or Kosak. First, UNDAF contends that it had no duty to prevent injury to Prokop after its instruction with Prokop ended. Second, UNDAF contends that it owed no duty to Kosak because it had no special relationship with Kosak. Additionally, UNDAF contends that the educational malpractice doctrine bars appellants' claim, that appellants failed to establish causation at trial, and that appellants never asserted claims against UNDAF and thus UNDAF cannot be held liable.

I.

We turn first to the products liability claim. But before reaching the merits of the claim, we consider two preliminary procedural issues raised by Cirrus. First, Cirrus contends that the federal district court "necessarily foreclose[d]" appellants' products liability claim based on negligence when the court dismissed on summary judgment appellants' strict liability for failure to instruct claim. *See Hauenstein v. Loctite Corp.*, 347 N.W.2d 272, 274 (Minn.1984) (" 'As a practical matter, where the strict liability claim is based on ... failure to warn ... there is essentially no difference between strict liability and negligence.' " (quoting *Holm v. Sponco Mfg., Inc.*, 324 N.W.2d 207, 215 (Minn. 1982))). Second, Cirrus contends that at trial appellants pleaded and argued a common law negligence claim, not a products liability claim. Thus, Cirrus contends that appellants are now attempting to "recharacterize" their common law negligence claim, and that the products liability claim is not before our court. Because we conclude that appellants' claim fails on its merits, we need not and do not reach these procedural issues.

II.

We turn now to the merits of the products liability claim. Appellants Glorvigen, Gartland, and Prokop's estate appeal from the court of appeals' reversal of the district court's denial of Cirrus's and UNDAF's motions for JMOL. We review a district court's denial of a JMOL motion de novo. *Bahr v. Boise Cascade Corp.*, 766 N.W.2d 910, 919 (Minn.2009). In this case, our review of the denial of the JMOL motions requires us to determine whether Cirrus owed a duty to Prokop or Kosak. We also review the existence of a duty de novo. *Bjerke v. Johnson*, 742 N.W.2d 660, 664 (Minn.2007). Finally, when reviewing the existence of a duty on denial of a JMOL motion, we view the evidence in the light most favorable to the verdict. *See Bahr*, 766 N.W.2d at 919.

Products liability is "[a] manufacturer's or seller's tort liability for any damages or injuries suffered by a buyer, user, or bystander as a result of a defective product. Products liability can be based on a theory of negligence, strict liability, or breach of warranty." *Black's Law Dictionary* 1328 (9th ed.2009). When liability is based on a theory of negligence, "a plaintiff must prove (1) the existence of a duty

of care, (2) a breach of that duty, (3) an injury, and (4) that the breach of the duty of care was a proximate cause of the injury." *Domagala v. Rolland*, 805 N.W.2d 14, 22 (Minn.2011). Duty is a threshold question "[b]ecause a defendant cannot breach a nonexistent duty." *Id.* Further, "whether there exists a duty is a legal issue for court resolution." *Germann v. F.L. Smithe Mach. Co.*, 395 N.W.2d 922, 924 (Minn.1986). If no duty exists, it is error for the district court to submit the negligence claim to the jury. *See id.* at 924–25.

In Minnesota, "negligence law on a supplier's duty to warn is well developed. In general, a supplier has a duty to warn end users of a dangerous product if it is reasonably foreseeable that an injury could occur in its use." *Gray v. Badger Mining Corp.*, 676 N.W.2d 268, 274 (Minn. 2004). A supplier's duty to warn extends to all "reasonably foreseeable users." *Hauenstein v. Loctite Corp.*, 347 N.W.2d 272, 275 (Minn.1984). We have described the duty to warn as consisting of "two duties: (1) [t]he duty to give adequate instructions for safe use; and (2) the duty to warn of dangers inherent in improper usage." *Frey v. Montgomery Ward & Co.*, 258 N.W.2d 782, 787 (Minn.1977). "To be legally adequate, [a] warning should (1) attract the attention of those that the product could harm; (2) explain the mechanism and mode of injury; and (3) provide instructions on ways to safely use the product to avoid injury." *Gray*, 676 N.W.2d at 274. Foreseeability is the "linchpin for determination whether a duty to warn exists." *Germann*, 395 N.W.2d at 924. To determine whether a duty to warn exists, our court

> goes to the event causing the damage and looks back to the alleged negligent act. If the connection is too remote to impose liability as a matter of public policy, [we] then hold there is no duty,

and consequently no liability. On the other hand, if the consequence is direct and is the type of occurrence that was or should have been reasonably foreseeable, [we] then hold as a matter of law a duty exists. Other issues such as adequacy of the warning, breach of duty and causation remain for jury resolution. *Id.* at 924–25.

Here, no party disputes that as a supplier and manufacturer of airplanes, Cirrus had a duty to warn foreseeable users like Prokop. Further, no party disputes that Cirrus's duty to warn included a "duty to give adequate instructions" on the safe use of Cirrus airplanes to foreseeable users. *Gray*, 676 N.W.2d at 274. Instead, the dispute centers on whether Cirrus's duty to warn required Cirrus to provide Flight Lesson 4a.

We conclude that Cirrus's duty to warn did not require Cirrus to provide Flight Lesson 4a. Cirrus provided Prokop with written instructions on the autopilot and recovery from VFR into IMC—the same information that was to be presented in Flight Lesson 4a—in a number of formats. The Pilot's Operating Handbook and Autopilot Pilot's Operating Handbook explained how to use the autopilot. The Cirrus SR22 Training Manual included diagrams about coping with inadvertent IMC. And Prokop watched PowerPoint slides about the autopilot and VFR into IMC during a ground lesson.

Appellants do not argue that these written instructions were inaccurate or incomplete, only that the written instructions could not adequately instruct Prokop in the safe use of the SR22 because the instructions necessarily lacked Flight Lesson 4a. We disagree. The duty to warn has never before required a supplier or manufacturer to provide training, only accurate and thorough instructions on the safe use of the product, as Cirrus has done here. *See Frey*, 258 N.W.2d at 787.

Our case law bears out this conclusion. For example, in *Frey v. Montgomery Ward & Co.,* we considered whether a manufacturer of space heaters breached its duty to warn because its *"printed booklets* did not state that the space heaters should not be used in house trailers"— information necessary to "assure safe use" of the product. *Id.* at 786, 788 (emphasis added). Likewise, in *Germann v. F.L. Smithe Machine Co.,* we held that the evidence was sufficient to support a verdict that a manufacturer of hydraulic presses breached its duty to warn because its *"manuals containing instructions* for assembling and maintenance" did not warn of the danger "of running the press without a properly attached and operating safety bar." 395 N.W.2d at 923, 925 (emphasis added). Finally, in *Gray v. Badger Mining Corp.,* we considered whether a supplier of sand had a duty to warn, looking to the supplier's *"warnings and safety instructions printed* on a Material Safety Data Sheet," to see if they adequately warned of the "hazards of silica dust." 676 N.W.2d at 272, 281–82 (emphasis added).

▉ These cases demonstrate that we have recognized that the duty to warn requires a supplier or manufacturer to provide adequate instructions and warnings to foreseeable users. *Frey,* 258 N.W.2d at 787. But there is no duty for suppliers or manufacturers to *train* users in the safe use of their product. Indeed, imposing a duty to train would be wholly unprecedented. Appellants cite no case— from any court—in which a supplier or

manufacturer was obligated to provide training in order to discharge its duty to warn. Yet that obligation is exactly what appellants request our court to impose here. Specifically, appellants argue that because it was foreseeable that "a pilot ... not adequately instructed *and trained* to take the necessary actions in the SR22 to escape from inadvertent entry into IMC" may have an accident, and because a "direct connection exists between the *omitted training* and the accident here ... a conclusion that a duty exists necessarily follows." (Emphasis added.) While we agree that foreseeability guides our determination of whether a duty to warn exists, we do not agree that foreseeability leads to a conclusion that Cirrus's duty to warn included an obligation to provide training.

Cirrus provided written instructions that "(1) attract[ed] the attention of those that the product could harm; (2) explain[ed] the mechanism and mode of injury; and (3) provide[d] instructions on ways to safely use the product to avoid injury," as required under our law. *Gray,* 676 N.W.2d at 274. Thus, Cirrus adequately discharged its duty to warn. Because Cirrus adequately discharged its duty to warn without providing training, to hold now that Cirrus must provide training would either create a new common law duty to train or expand the duty to warn to include training. Under either theory, imposition of a duty to train would require an unprecedented expansion of the law, and we decline to do so. Accordingly, we conclude that Cirrus did not owe a duty to train Prokop.[7]

7. The dissent argues that the question whether Cirrus was obligated to provide training to Prokop was for jury resolution. We disagree. The dissent is correct that the adequacy of a warning is for jury resolution, but whether a duty exists at all is for court resolution. *Germann,* 395 N.W.2d at 924. As noted earlier, whether a duty exists is a "threshold" question "[b]ecause a defendant cannot breach a

nonexistent duty." *Domagala,* 805 N.W.2d at 22. Thus, if no duty exists as a matter of law, the remaining elements of the claim should not be submitted to the jury. Because no duty to train exists as a matter of law, it was improper in this case for the jury to consider whether Cirrus breached that duty, and we need not defer to the jury's determination.

■ This conclusion does not end our analysis, however. While Cirrus did not owe a duty to train Prokop, Cirrus may have assumed a duty to provide Flight Lesson 4a by undertaking to provide the lesson. We have said that "[i]t is ancient learning that one who assumes to act, even though gratuitously, may thereby become subject to the duty of acting carefully, if he acts at all." *Isler v. Burman*, 305 Minn. 288, 295, 232 N.W.2d 818, 822 (1975) (citation omitted). In other words, "one who voluntarily assumes a duty must exercise reasonable care," even if he is not otherwise obligated to provide the care, "or he will be responsible for damages resulting from his failure to do so." *Id.* at 295, 232 N.W.2d at 822

■ Nevertheless, a party is not responsible for damages in tort if the duty breached was " 'merely . . . imposed by contract,' " and not " 'imposed by law.' " *D & A Dev. Co. v. Butler*, 357 N.W.2d 156, 158 (Minn.App.1984) (quoting *Keiper v. Anderson*, 138 Minn. 392, 398, 165 N.W. 237, 238 (1917)). The " 'fundamental difference[s] between tort and contract' " actions support this rule. *Id.* at 158 (quoting W. Prosser, *Handbook of the Law of Torts* § 92, at 613 (4th ed.1971)). We explained those differences in *80 South Eighth Street Ltd. Partnership v. Carey–Canada, Inc.*:

> Tort actions and contract actions protect different interests. Through a tort action, the duty of certain conduct is imposed by law and not necessarily by the will or intention of the parties. The duty may be owed to all those within the range of harm, or to a particular class of people. On the other hand, contract actions protect the interests in having promises performed. Contract obligations are imposed because of conduct of the parties manifesting consent, and are owed only to the specific parties named in the contract.

486 N.W.2d 393, 395–96 (Minn.1992). Because of the differences between tort and contract actions, "[w]hen a contract provides the only source of duties between the parties, Minnesota law does not permit the breach of those duties to support a cause of action in negligence." *United States v. Johnson*, 853 F.2d 619, 622 (8th Cir.1988) (citing *Lesmeister v. Dilly*, 330 N.W.2d 95, 102 (Minn.1983)).

■ Here, Prokop contracted with Cirrus to purchase the SR22. In that contract, Cirrus undertook to provide Flight Lesson 4a as part of the transition training included in the purchase price of the SR22. Accordingly, Cirrus's obligation to provide Flight Lesson 4a arose from the contract. Where a party cannot prove that the duty at issue arose independent of a contract, "Minnesota law precludes [that party] from recovering in negligence based upon breach of [that duty.]" *Johnson*, 853 F.2d at 622. As discussed above, we conclude that Cirrus does not owe a duty imposed by law to provide Flight Lesson 4a. Thus, because the duty at issue—to provide Flight Lesson 4a—could only have arisen from the contract, appellants may not recover in tort. *See id.; D & A Dev. Co.*, 357 N.W.2d at 158–59.

Because we conclude that (1) Cirrus did not owe a duty to train and that (2) Cirrus did not assume a duty to provide Flight Lesson 4a outside of its contract with Prokop, we hold that Cirrus did not owe a duty to Prokop or Kosak, the breach of which is recoverable in tort. We therefore hold that the district court erred when it denied Cirrus's and UNDAF's motions for JMOL, and affirm the court of appeals. Accordingly, we do not reach the issues of educational malpractice, causation, or UNDAF's liability.

Affirmed.

STRAS, J., took no part in the consideration or decision of this case.

ANDERSON, PAUL H., Justice, dissenting.

I respectfully dissent. I write separately because I disagree with the majority's holding that as a matter of law no consumer product exists for which a supplier is required to give any warning to consumers beyond written instructions, no matter how dangerous the product, and regardless of any jury findings to the contrary. The majority makes this holding even in the face of a supplier's promise—here, Cirrus's promise—to provide certain nonwritten instructions. I conclude the majority's holding usurps the role of the jury and misreads our precedent. In particular, I would defer to the verdict, which is based on the jury's finding that Cirrus's warning to Prokop was inadequate without Flight Lesson 4a. I would also hold that Cirrus assumed a duty in tort despite maintaining a contractual relationship with Prokop. Therefore, I would reverse the court of appeals and allow the jury verdict to stand.

## I.

To prove a products liability claim based on a theory of negligence, appellants Glorvigen, Gartland, and Prokop's estate "must prove (1) the existence of a duty of care, (2) a breach of that duty, (3) an injury, and (4) that the breach of the duty of care was a proximate cause of the injury." *Domagala v. Rolland*, 805 N.W.2d 14, 22 (Minn. 2011). In Minnesota, suppliers of dangerous products have "a duty to warn end users of [the] dangerous product if it is reasonably foreseeable that an injury could occur in its use." *Gray v. Badger Mining Corp.*, 676 N.W.2d 268, 274 (Minn.2004). The existence of a duty to warn is a legal question "for court resolution." *Germann v. F.L. Smithe Mach. Co.*, 395 N.W.2d 922, 924 (Minn.1986). In this case, both the

federal district court and state district court determined that Cirrus owed a duty to warn foreseeable users like Prokop. No party argues otherwise.

After the state district court determined that Cirrus owed a duty to warn, that court submitted the remaining elements of appellants' claim to the jury. The court properly submitted these elements to the jury because while the existence of a duty to warn is for court resolution, the other elements of a products liability negligence claim are not. *Balder v. Haley*, 399 N.W.2d 77, 81 (Minn.1987); *Germann*, 395 N.W.2d at 924–25. Specifically, the "adequacy of the warning" should "remain for jury resolution." *Balder*, 399 N.W.2d at 81; *Germann*, 395 N.W.2d at 924–25. In other words, once the state district court determined that Cirrus owed a duty to warn, it was up to the jury—not the court, and certainly not our court—to determine whether Cirrus provided an adequate warning or whether Cirrus breached its duty to warn. Here, the jury determined that Cirrus's warning was inadequate—despite all of the written materials Cirrus provided to Prokop.

We do not disturb a jury's verdict unless the verdict cannot "be sustained on any reasonable theory of the evidence." *Pouliot v. Fitzsimmons*, 582 N.W.2d 221, 224 (Minn.1998). In this case, the jury's verdict was amply supported by evidence in the record. The jury heard evidence that in-flight instruction on recovery from VFR into IMC[1] was necessary to learn how to safely exit IMC in the SR22 because, according to the University of North Dakota's Aerospace Foundation's director of transition training, instruction like Flight Lesson 4a was the only way "for th[e] training to take [because] you can't just do it on the ground.... It has to be done up

---

1. As noted by the majority, VFR into IMC is an emergency situation in which the pilot loses the ability to see the horizon and must navigate the airplane through use of instruments alone.

in the sky with the pilot." The jury also heard evidence that Prokop never received in-flight instruction on recovery from VFR into IMC. Finally, the jury heard evidence that Prokop crashed and died while attempting to recover from VFR into IMC.

Based on the foregoing evidence, the jury determined that Cirrus's written materials alone provided an inadequate warning. The jury apparently found the warning inadequate because the warning lacked Flight Lesson 4a, the only hands-on, inflight training in recovery from VFR into IMC that Cirrus offered to Prokop. Thus, the jury determined that Cirrus breached its duty to warn and returned a verdict awarding damages to the next of kin of Prokop and Kosak to help compensate them for Cirrus's breach. Because the adequacy of the warning was for jury resolution, and because the jury's determination is sustained by a "reasonable theory of the evidence," I conclude that the determination is not of the type that our court has the authority to disregard. *Pouliot,* 582 N.W.2d at 224; *Germann,* 395 N.W.2d at 924–25.

Nevertheless, the majority holds as a matter of law that Cirrus was not required to provide Flight Lesson 4a. The majority does so on the theory that deferring to the jury's determination would, in effect, require a new duty of suppliers—a duty to train. Specifically, Cirrus and amici argue, and the majority accepts, that if we were to hold that Cirrus was obligated to provide Flight Lesson 4a in order to adequately discharge its duty to warn, then all suppliers—even suppliers of coffee pots, according to statements made during oral arguments—will be required to provide training to their users. This argument

overreacts to the scope and impact of such a holding.

First, this court does not determine what Cirrus, or any other supplier, must provide to adequately discharge its duty to warn; rather, we determine only the features a warning must possess.[2] Further, we do not determine what form such a warning must take—the jury makes that determination. *See Balder,* 399 N.W.2d at 81. The jury's determination will vary from case to case, based on the facts of the case and the type of product the supplier provides.

Second, suppliers must use care "commensurate" with "reasonably foreseeable dangers"—not with any conceivable danger. *Domagala,* 805 N.W.2d at 28. We have said that " '[w]hat constitutes reasonable care will, of course, vary with the surrounding circumstances and will involve a balancing of the likelihood of harm, and the gravity of harm if it happens, against the burden of the precaution which would be effective to avoid the harm.' " *Bilotta v. Kelley Co.,* 346 N.W.2d 616, 621 (Minn. 1984) (quoting *Holm v. Sponco,* 324 N.W.2d 207, 212 (Minn.1982)). For example, I find it absurd to assert that the "reasonably foreseeable dangers" of operating a coffee pot are akin to the "reasonably foreseeable dangers" of operating the SR22, an undisputedly fast and highly sophisticated airplane. *Domagala,* 805 N.W.2d at 28. Thus, I also find it absurd to assert that the reasonable care required of a coffee pot supplier, and therefore the type of warning a coffee pot supplier must provide to consumers, is akin to the type of warning that Cirrus must provide to consumers who purchase and intend to operate the SR22.

---

**2.** We have said that to be "legally adequate," a supplier's warning to a user of any foreseeable dangers associated with the products intended use "should (1) attract the attention of those that the product could harm; (2) ex-
plain the mechanism and mode of injury; and (3) provide instructions on ways to safely use the product to avoid injury." *Gray v. Badger Mining Corp.,* 676 N.W.2d 268, 274 (Minn. 2004).

Far from imposing a new duty to train on suppliers, the jury in this case simply determined that a supplier of a dangerous product must provide a warning commensurate with that danger to consumers, as required under our case law. I conclude that the majority mistook whether Cirrus owed a duty to warn, which was for court resolution, for the question whether Cirrus adequately discharged its duty to warn, which was for jury resolution. *Germann*, 395 N.W.2d at 924–25. Accordingly, I conclude that the majority oversteps our authority on review when the majority holds that Cirrus was not required to provide Flight Lesson 4a to adequately discharge its duty to warn, a conclusion that is clearly contrary to the jury's determination. I would defer to the jury's proper determination and hold that Cirrus's warning to Prokop was inadequate.

## II.

Even if the majority is correct that deferring to the jury's determination would impose a new duty to train on suppliers, I would still hold that Cirrus owed a duty to provide Flight Lesson 4a because Cirrus assumed that duty. The majority holds that Cirrus cannot assume a duty in tort because Cirrus maintained a contractual relationship with Prokop. But it is well established in our case law that a party can assume a duty in tort despite maintaining a contractual relationship.[3] Therefore, I disagree with the majority on this key point. In particular, I conclude that the majority has overlooked specific accommodation in our case law that would allow the next of kin of Prokop and Kosak to recover in tort against Cirrus despite the contract.

---

**3.** Moreover, under our case law, a party can assume a duty in tort *through* a contractual relationship. *See, e.g., Walsh v. Pagra Air Taxi, Inc.*, 282 N.W.2d 567, 570–71 (Minn.

We have said that when the "gravamen of [a] case ... is contractual," and "[a]ny duties between the parties arose out of contracts," a party cannot be held liable in negligence. *Lesmeister v. Dilly*, 330 N.W.2d 95, 102 (Minn.1983). In other words, "[w]hen a contract provides the only source of duties between the parties, Minnesota law does not permit the breach of those duties to support a cause of action in negligence." *United States v. Johnson*, 853 F.2d 619, 622 (8th Cir.1988) (citing *Lesmeister*, 330 N.W.2d at 102). But even when parties are bound by contract, our case law explicitly excludes claims arising from personal injury and for damages other than economic loss from the general rule that a party cannot be liable in tort. *See, e.g., 80 S. Eighth St. Ltd. P'ship v. Carey–Canada, Inc.*, 486 N.W.2d 393, 396 (Minn.1992) ("[E]conomic losses that arise out of commercial transactions, *except those involving personal injury* or damage to other property, are not recoverable under the tort theories of negligence or strict products liability." (emphasis added) (citation omitted) (internal quotation marks omitted)). Additionally, we appear to have adopted Restatement (Second) of Torts § 323 (1965), which states that a party can assume a duty in tort even if undertaken "for consideration." Restatement (Second) of Torts § 323 provides that

[o]ne who undertakes, gratuitously *or for consideration*, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if

---

1979) (holding that an airport base operator was liable for breach of a tort duty the operator assumed through its operating agreement with a city).

(a) his failure to exercise such care increases the risk of such harm, or

(b) the harm is suffered because of the other's reliance upon the undertaking.

(Emphasis added.) *See, e.g., Funchess v. Cecil Newman Corp.,* 632 N.W.2d 666, 674 (Minn.2001); *State v. Philip Morris Inc.,* 551 N.W.2d 490, 493–94 (Minn.1996). That a person can undertake a duty in tort "for consideration" indicates that a person can assume a duty in tort through contract.

In this case, it is undisputed that Cirrus entered into a contract with Prokop for the sale of the SR22 and that the contract specified that transition training was included in the purchase price. Based on this fact alone, the majority ends its analysis and holds that because Cirrus promised by contract to provide transition training, including Flight Lesson 4a, Cirrus cannot be held liable in tort for failing to provide Flight Lesson 4a. But our case law requires that our analysis go further.

As an initial matter, the "gravamen" of this case is not contractual. *Lesmeister,* 330 N.W.2d at 102. Instead, the "gravamen" of this case sounds in tort. *Id.* The parties assert only tort-based claims, and the parties' relationship is as much governed by Cirrus's tort duty to warn as the relationship is governed by Cirrus's contractual duties. Certainly the contract gives rise to Cirrus's duty to warn (if Prokop never contracted for the SR22, Cirrus would not owe a duty to warn to Prokop), but it is Cirrus's status as the manufacturer and supplier of the SR22, not the contract, that imposes the tort duty to warn. *See, e.g., Johnson,* 853 F.2d at 622 (holding that where "a contract provide[d] *the only source of duties* between the parties," tort liability was improper (emphasis added)).

Moreover, the claim in this case involves each of the two specific accommodations we have made in the past allowing a party to be liable in tort despite the presence of a contract. First, the claim at issue involves personal injury. *See 80 S. Eighth St.,* 486 N.W.2d at 396. Second, the claim involves non-economic-loss damages. *See id.; see also Black's Law Dictionary* 589 (9th ed.2009) (defining "economic loss" in a products liability suit as "includ[ing] the cost of repair or replacement of defective property, as well as commercial loss for the property's inadequate value and consequent loss of profits or use"). Instead of seeking economic loss damages like the cost to repair the SR22, the parties seek such damages as "[l]oss of counsel, guidance, aid, advice, comfort, [a]ssistance, protection, and companionship." Because we have recognized that a tort duty can be assumed for consideration, *see* Restatement (Second) of Torts § 323, and because we have distinguished between claims arising from purely economic loss and claims arising from personal injury, our case law provides a basis to conclude that Cirrus assumed a duty in tort despite Cirrus's contract with Prokop.

The majority reaches the opposite result. More specifically, the majority concludes that because we did not impose tort liability in cases in which the claim did not involve personal injury or non-economic-loss damages, we may not impose tort liability when a claim *does* involve personal injury and non-economic-loss damages. This conclusion overlooks the accommodation we have made in our case law for claims involving personal injury and non-economic-loss damages. Instead of restricting the result in this case, our case law does the exact opposite—it anticipates and intentionally accommodates an imposition of tort liability on Cirrus.[4]

---

4. Other jurisdictions also tend to allow a plaintiff to recover in tort even when the

defendant assumed a duty through, or in addition to, a contract. For example, the Mary-

It should be self-evident that a party who breaches a contract ought to be liable for the breach of that contract. But a party should not be "immunize[d] . . . from tort liability for his wrongful acts," just because those acts "grow out of" or are "coincident" to a contract. *Eads v. Marks,* 39 Cal.2d 807, 249 P.2d 257, 260 (1952). If the mere presence of a contract foreclosed all tort liability, medical malpractice claims would cease to exist. A passenger injured in a car accident while riding in a taxi cab would have only a breach of contract claim against the cab driver and cab company. A paid babysitter who failed to prevent injury to a child would be liable only in contract. The list goes on. While we have rightly limited tort liability when the relationship of the parties is governed purely by contract, we have never foreclosed— indeed, we have specifically accommodated—tort liability when personal injury or non-economic-loss damages are asserted.

I conclude that the majority's holding overlooks this accommodation. In contrast, I would hold that Cirrus may assume a duty in tort to provide Flight Lesson 4a despite Cirrus's contract with Prokop. I reach this conclusion because the parties' relationship is grounded in tort as well as contract, and because the claim involves personal injury and non-economic-loss damages. Further, I would conclude that by promising to provide Flight Lesson 4a, Cirrus did assume a duty in tort and may be held liable for breaching that duty.

On a final note, I am concerned about the far-reaching consequences of the majority's holding in this case. By holding that a supplier of a dangerous product, such as the SR22, is never required to provide anything beyond written instructions—even if the supplier has promised to provide nonwritten instructions—the majority has essentially held that no consumer of a dangerous product may ever hold a supplier liable for personal injury arising out of defective nonwritten instructions. Instead, the majority's holding indicates that the only remedy available to the injured consumer will be breach of contract. But as the majority indicates in its opinion, contract damages are generally inadequate and ill-suited for personal injury claims.

Based on the foregoing analysis, in which I conclude that the majority has usurped the role of the jury and misread our case law, I would hold that Cirrus breached its duty to warn when it failed to provide Flight Lesson 4a as promised. Therefore, I would reverse the court of appeals and allow the jury verdict to stand.

PAGE, Justice (dissenting).

I join in the dissent of Justice Paul H. Anderson.

land Court of Appeals (the state's highest court) explained that while not every contract will give rise to a tort duty, "[w]here a contractual relationship exists between persons and at the same time a duty is imposed by or arises out of the circumstances surrounding or attending the transaction, the breach of such duty is a tort," and the injured party may choose to sue in tort or for breach of contract. *Jacques v. First Nat'l Bank of Md.,* 307 Md. 527, 515 A.2d 756, 759 (1986) (citation omitted). When determining whether to impose tort liability, the court considers (1) the nature of the harm likely to arise, and (2) the relationship of the parties. *Id.* Where the harm likely to arise is personal injury, the court imposes tort liability. *Id.* at 760; *see also, e.g., Eads v. Marks,* 39 Cal.2d 807, 249 P.2d 257, 260 (1952) ("A tort may grow out of or be coincident with a contract, and the existence of a contractual relationship does not immunize a tortfeasor from tort liability for his wrongful acts in breach of the contract.").